Filed 1/13/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FOOTHILL COMMUNITIES COALITION, | |
| Plaintiff and Appellant, | G047326 |
| v. | (Super. Ct. No. 30-2011-00467132) |
| COUNTY OF ORANGE et al., | O P I N I O N |
| Defendants and Appellants; | |
| ROMAN CATHOLIC DIOCESE OF ORANGE et al., | |
| Real Parties in Interest and Appellants. | |
| FOOTHILL COMMUNITIES COALITION, | |
| Plaintiff and Appellant, | G048024 |
| v. | |
| COUNTY OF ORANGE et al., | |
| Defendants and Respondents; | |
| ROMAN CATHOLIC DIOCESE OF ORANGE et al., | |
| Real Parties in Interest and Respondents. | |

Appeals from a judgment in No. G047326 and a postjudgment order in No. G048024 of the Superior Court of Orange County, Gail Andrea Andler, Judge. Judgment reversed and remanded with directions. Appeal from postjudgment order dismissed as moot.

Leibold McClendon & Mann and John G. McClendon for Plaintiff and Appellant in Nos. G047326 and G048024.

Nicholas S. Chrisos, County Counsel, Roger Freeman and Nicole M. Walsh, Deputy County Counsel, for Defendants and Appellants in No. G047326.

Manatt, Phelps & Phillips, Jack S. Yeh and Keli N. Osaki for Real Parties in Interest and Appellants in No. G047326 and for Real Parties in Interest and Respondents in No. G048024.

No appearance for Defendants and Respondents in No. G048024.

*          *          *

INTRODUCTION

The Roman Catholic Diocese of Orange (the Diocese) and Kisco Senior Living, LLC (Kisco), desire to build a living community for senior citizens on a parcel of real property, owned by the Diocese (the Project), which is located in an unincorporated area of Orange County (the County). The County Board of Supervisors (the Board) created a new zoning definition for senior residential housing, and applied it to the Project site; found the Project was consistent with the County's general plan and the "North Tustin Specific Plan" (sometimes referred to as NTSP); and found the Project complied with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA). Foothill Communities Coalition, an unincorporated association of grassroots community groups and area homeowners (Foothill), challenged the Board's

decisions by means of a petition for a peremptory writ of mandate. The trial court entered judgment in favor of Foothill, and issued the requested writ.

Appellants[1] challenge the trial court's conclusion that the Board's acts constitute impermissible spot zoning. We publish this case to clarify the law regarding spot zoning in two respects. First, spot zoning may occur whether a small parcel of property is subject to *more or less restrictive* zoning than the surrounding properties. Second, to determine whether *impermissible* spot zoning has occurred, a court is required to conduct a two-part analysis. After determining that spot zoning has actually occurred, the court must determine whether the record shows the spot zoning is in the public interest.

In this case, applying the required standard of review, which is deferential to the Board, we conclude the Board's findings that the Project would be consistent with the County's general plan and with the North Tustin Specific Plan are supported by substantial evidence. The creation of the new senior residential housing zone and its application to the Project site were not arbitrary or capricious, or lacking in evidentiary support. Although the Board's actions constituted spot zoning, the spot zoning was permissible. The trial court erred in entering judgment in Foothill's favor and in issuing the writ of mandate. We therefore reverse. As explained in detail, *post*, we remand the matter for further consideration by the trial court of issues relating to CEQA.

Our reversal of the judgment renders moot Foothill's appeal[2] challenging the trial court's refusal to award it attorney fees as the prevailing party. (*Costa Serena*

---

[1] The Diocese, Kisco, the County, and the Board filed a joint appellants' opening brief. The County and the Board thereafter advised this court that they would not make any further appearances in the case. For ease of reference throughout the opinion, we will refer to the Diocese, Kisco, the County, and the Board, collectively as Appellants.

[2] On our own motion, we order the companion appeal, No. G048024, consolidated with appeal No. G047326.

*Owners Coalition v. Costa Serena Architectural Com.* (2009) 175 Cal.App.4th 1175, 1206.)

STATEMENT OF FACTS, CHRONOLOGY, AND PROCEDURAL HISTORY

In 1956, the Diocese received a gift of a 7.25-acre parcel of undeveloped property in the North Tustin area of the County. In 2003, the Diocese decided to develop the property as a senior residential community. The Diocese retained senior living communities developer Kisco to design and implement the Project. In January 2009, the Diocese and Kisco submitted to the County a project design proposing 153 senior living units.

The Project site is located within the area covered by the North Tustin Specific Plan, which regulates the development of property within its boundaries and was adopted by the Board in 1982. Under the North Tustin Specific Plan, the Project site is designated as residential single-family. In July 2009, the County issued a notice of preparation for the Project's environmental impact report (EIR). The draft EIR was released in May 2010 for a 45-day public comment period. The final EIR was released by the County in December 2010.

In January 2011, the County Planning Commission conducted a public hearing on the Project, at the end of which it recommended that the Board approve the Project and certify the final EIR. The Board conducted a public hearing on the Project, after which it issued one ordinance and two resolutions approving the Project and making necessary changes to the North Tustin Specific Plan to permit its development. In ordinance No. 11-008, the Board amended the North Tustin Specific Plan to add a new zoning district for senior residential housing and to change the land use district for the Project site to the new senior residential housing designation. In resolution No. 11-038, the Board certified the EIR for the Project as complete, accurate, and in compliance with the requirements of CEQA. And in resolution No. 11-039, the Board approved both a use

4

permit for the Project as a senior living facility, and a site development permit. In March 2011, the Board amended the North Tustin Specific Plan to create a new zoning district—the senior residential housing land use district—which it applied to the Project site. The same month, the County filed a notice of determination of the Board's approval of the Project and certification of the final EIR.

In April 2011, Foothill filed a verified petition for a writ of mandate and complaint for declaratory relief against the County and the Board. In March 2012, the trial court issued a minute order granting the petition. Judgment was entered. Foothill filed a motion for a new trial (in order to clarify whether the writ and the judgment resolved the CEQA issues raised in the petition), which was denied. Foothill, the Diocese and Kisco, and the County and the Board filed separate, timely notices of appeal.

DISCUSSION

I.

*STANDARD OF REVIEW*

"The 'rezoning of property, even a single parcel, is generally considered to be a quasi-legislative act' thus 'subject to review under ordinary mandamus.' The standard for review of a quasi-legislative act is whether the action was 'arbitrary or capricious or totally lacking in evidentiary support.' [Citations.]" (*Avenida San Juan Partnership v. City of San Clemente* (2011) 201 Cal.App.4th 1256, 1268; see *Arnel Development Co. v. City of Costa Mesa* (1980) 28 Cal.3d 511, 521-522; *Wilkins v. City of San Bernardino* (1946) 29 Cal.2d 332, 338-340 (*Wilkins*).)[3]

---

[3] The trial court applied the proper standard of review of the Board's decision, as evidenced by the court's minute order which reads, in relevant part: "The court finds that the passage of the ordinance providing for the new zoning was arbitrary and/or capricious."

"'In a mandamus proceeding, the ultimate question, whether the agency's action was arbitrary or capricious, is a question of law. [Citations.] Trial and appellate courts therefore perform the same function and the trial court's statement of decision has no conclusive effect upon us. [Citation.]' [Citation.]" (*Western/California, Ltd. v. Dry Creek Joint Elementary School Dist.* (1996) 50 Cal.App.4th 1461, 1492.)

The party challenging a zoning ordinance as arbitrary or capricious bears the burden of producing sufficient evidence from which the trier of fact may conclude that the ordinance is unreasonable and invalid. (*Wilkins*, *supra*, 29 Cal.2d at p. 338; *County of Butte v. Bach* (1985) 172 Cal.App.3d 848, 860.) In this case, the burden of proof was on Foothill.[4]

II.

*APPELLANTS' APPEALS*

A.

*Zoning Decisions Are Exercises of the County's Police Power.*

"It is well settled that zoning ordinances, when reasonable in object and not arbitrary in operation, constitute a justifiable exercise of police power, and that the establishment, as part of a comprehensive and systematic plan, of districts devoted to strictly private residences or single family dwellings, from which are excluded business or multiple dwelling structures, is a legitimate exercise of the police power." (*Wilkins*, *supra*, 29 Cal.2d at p. 337.)

The Project site is subject to both the County's general plan and a specific plan. "[T]he general plan [is] a '"constitution" for future development' [citation] located at the top of 'the hierarchy of local government law regulating land use' [citation]. [¶] The general plan consists of a 'statement of development policies . . . setting forth

_____

[4] We do not find persuasive the out-of-state cases cited by Foothill, which place the burden of proof on a governmental agency making a zoning change.

objectives, principles, standards, and plan proposals.' [Citation.] The plan must include seven elements—land use, circulation, conservation, housing, noise, safety and open space—and address each of these elements in whatever level of detail local conditions require [citation]. General plans are also required to be 'comprehensive [and] long[]term' [citation] as well as 'internally consistent.' [Citation.] The planning law thus compels cities and counties to undergo the discipline of drafting a master plan to guide future local land use decisions." (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 772-773, fn. omitted.)

A specific plan, such as the North Tustin Specific Plan, is usually more detailed than a general plan, and covers specific parts of the community. The approval of a specific plan does not create a vested right to develop property in a manner consistent with the specific plan, or to prevent development inconsistent with it. (*People v. County of Kern* (1974) 39 Cal.App.3d 830, 837-838.) A specific plan may be adopted or amended by resolution or ordinance of the appropriate legislative body. (Gov. Code, §§ 65358, 65453.) These sections of the Government Code recognize that "[a] county's needs necessarily change over time . . . . It follows that a county must have the power to modify its land use plans as circumstances require." (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 357-358.) Despite Foothill's argument to the contrary, the North Tustin Specific Plan does not constitute a contract entered into by the County. (See Gov. Code, § 65453, subd. (a) [specific plans "may be amended as often as deemed necessary by the legislative body"].)

A particular project must be "compatible with the objectives, policies, general land uses, and programs specified in" the general plan or any applicable, officially adopted specific plan. (Gov. Code, § 66473.5.) Government Code section 66473.5 has been interpreted "as requiring that a project be '"in agreement or harmony with"' the terms of the applicable plan, not in rigid conformity with every detail

7

thereof." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678.)

The ordinance by which the new senior residential housing zoning district was created and applied to the Project site reads, in relevant part, as follows: "The County, after balancing the specific economic, legal, social, technological, and other benefits of the proposed Project, has determined that the unavoidable adverse environmental impacts identified . . . may be considered acceptable due to the following specific considerations which outweigh the unavoidable, adverse environmental impacts of the proposed Project, each of which standing alone is sufficient to support approval of the Project . . . ." The specific considerations identified by the County include: (1) the Project addresses the housing element goals for senior housing set forth in the County's general plan, (2) the Project is compatible with the character of the surrounding neighborhood, (3) the Project addresses and remedies existing issues with storm drains and runoff, (4) the Project would provide for a deed restriction to be imposed on the property, so that future owners would be prohibited from other incompatible uses, and (5) the Project allows for implementation of policies set forth in the North Tustin Specific Plan.

B.

*Spot Zoning*

Foothill contends the zoning change created an instance of impermissible spot zoning. "The essence of spot zoning is irrational discrimination." (*Avenida San Juan Partnership v. City of San Clemente*, *supra*, 201 Cal.App.4th at p. 1268.) "Spot zoning is one type of discriminatory zoning ordinance. [Citation.] 'Spot zoning occurs where a small parcel is restricted and given lesser rights than the surrounding property, as where a lot in the center of a business or commercial district is limited to uses for residential purposes thereby creating an "island" in the middle of a larger area devoted to other uses. [Citation.] Usually spot zoning involves a small parcel of land, the larger the

8

property the more difficult it is to sustain an allegation of spot zoning.  [Citations.] Likewise, where the "spot" is not an island but is connected on some sides to a like zone the allegation of spot zoning is more difficult to establish since lines must be drawn at some point.  [Citation.]  Even where a small island is created in the midst of less restrictive zoning, the zoning may be upheld where rational reason in the public benefit exists for such a classification.'  [Citation.]"  (*Arcadia Development Co. v. City of Morgan Hill* (2011) 197 Cal.App.4th 1526, 1536.)

Appellants correctly note that no published case in California has directly addressed the type of spot zoning at issue here—where the small parcel is given *greater rights* than the surrounding property.  We reject Appellants' argument that this means the zoning change by the Board is not spot zoning.  "A spot zone results when a small parcel of land is subject to more *or less* restrictive zoning than surrounding properties." (Hagman et al., Cal. Zoning Practice (Cont.Ed.Bar 1969) § 5.33, p. 152, italics added.) Several published cases in California indirectly acknowledge that spot zoning occurs whether the "spot" is subject to more or less restrictive zoning than the surrounding property.  In *Tandy v. City of Oakland* (1962) 208 Cal.App.2d 609, 611, a property's owners petitioned for a writ of mandate to compel the city to rezone the property from multiple dwelling to commercial, which would have made the petitioners' property an island of less restrictive zoning.  The appellate court rejected the petitioners' request, not because it did not raise an issue of spot zoning, but because it was inappropriate for the courts to interfere with a distinctly legislative decision:  "The propriety of rezoning plaintiffs' single parcel from multiple dwelling to commercial while maintaining the remainder of the area in a multiple dwelling zone is a matter of legislative determination, and where, as here, there is room for difference of opinion on the subject, the courts will not interfere with the legislative determination.  [Citations.]"  (*Id.* at p. 612.)

In *Case v. City of Los Angeles* (1956) 142 Cal.App.2d 66, 67-68, the owner of 26 acres of land zoned "C-2" sought a change in zoning to the less restrictive "C-M"

9

for three and one-third acres of its total acreage; the remaining portion of the owner's property would remain zoned as C-2. The trial court found that the ordinance by which the city made the requested zoning change "'violates good zoning practice and comprehensive zoning planning and does not satisfy or meet good zoning practice and was arbitrary and discriminatory with respect to owners of property similarly situated.'" (*Id.* at p. 67.) The appellate court accepted that the zoning change was an example of spot zoning, but reversed a portion of the judgment because the plaintiffs (who owned property that did not adjoin the rezoned property and did not share either the original or the amended zoning classification) did not have standing to pursue their claim: "While ordinances for spot zoning and those which create monopolies are examples of illegal, unreasonable, arbitrary and discriminatory zoning [citations], in an action for declaratory relief . . . [citation] the court is authorized to determine and declare only the issues between the parties to the action. It having been found in the instant action that none of plaintiffs' properties is 'similarly situated' to that zoned by Ordinance Number 100,775, and that none of plaintiffs' rights are infringed by it, the paragraph of said judgment from which defendants have appealed is a declaration concerning matters not properly in issue." (*Id.* at p. 70.)[5]

[5] Appellants argue in their opening brief that Foothill lacked standing to seek the writ because Foothill was not the owner of the "spot" and had not suffered any harm as a result of the change in the zoning of the spot. In an instance where spot zoning favors the owner of the spot by loosening the zoning restrictions that continue to apply to the surrounding property owners, those surrounding property owners have standing to challenge the zoning change. Foothill is described in its petition as "an unincorporated umbrella organization composed of and supported by grassroots community groups and others devoted to the preservation of the environment," whose members reside and/or own real property in and around the North Tustin area. Appellants do not argue Foothill lacked standing because its members, or the members of the community groups comprising Foothill, did not own property surrounding the Project site that remained subject to the single-family residential housing zone.

In *Wilkins*, *supra*, 29 Cal.2d at page 341, the California Supreme Court agreed that spot zoning exists when the spot receives either more or less restrictive zoning, although the opinion implies that only the application of more restrictive zoning is problematic: "So-called 'spot' zoning results in the creation of two types of 'islands.' As pointed out above, the objectionable type arises when the zoning authority improperly limits the use which may be made of a small parcel located in the center of an unrestricted area. The second type of 'island' results when most of a large district is devoted to a limited or restricted use, but additional uses are permitted in one or more 'spots' in the district. It is the second type of 'island' that is presented in this case, and if there is any discrimination, it is in *favor* of the 'island' since it may be devoted to a greater number of uses than the surrounding territory. It is clearly within the discretion of the legislative body of the city to determine whether such an 'island' should be enlarged or not, and the mere fact that the owner may enjoy greater benefits, or that his property will be enhanced in value, if the size of the island is increased, cannot entitle him to compel the allowance of such increase in size." In *Wilkins*, the city had twice denied a property owner's request that his property be rezoned from single-family residential to business. (*Id.* at pp. 334-335.) The trial court, in ruling on the property owner's declaratory relief claim, determined the zoning ordinance was unconstitutional as applied to that property owner, and enjoined its enforcement against him. (*Id.* at p. 334.)

The Supreme Court reversed the judgment, and set forth two clear rules of law applicable to challenges to zoning decisions. First, "[t]he courts cannot write the zoning laws and cannot say that the legislative body has erred in drawing the lines of the districts, or in restricting the territory devoted to business or to multiple dwellings, unless there is a clear showing of abuse of legislative discretion." (*Wilkins*, *supra*, 29 Cal.2d at p. 339.) Second, "[w]here it is claimed that the ordinance is unreasonable as applied to plaintiff's property, or that a change in conditions has rendered application of the ordinance unreasonable, it is incumbent on plaintiff to produce sufficient evidence from

11

which the court can make such findings as to the physical facts involved as will justify it in concluding, as a matter of law, that the ordinance is unreasonable and invalid. It is not sufficient for him to show that it will be more profitable to him to make other use of his property, or that such other use will not cause injury to the public, but he must show an abuse of discretion on the part of the zoning authorities and that there has been an unreasonable and unwarranted exercise of the police power." (*Id.* at p. 338.)

Many other jurisdictions have concluded that an amendment to a zoning ordinance that singles out a small parcel of land for a use different from that of the surrounding properties and for the benefit of the owner of the small parcel and to the detriment of other owners is spot zoning. (See, e.g., *Yellow Lantern Kampground v. Town of Cortlandville* (N.Y.App.Div. 2000) 279 A.D.2d 6, 9 [716 N.Y.S.2d 786, 788-789]; *Schubach v. Zoning Board of Adjustment* (1970) 440 Pa. 249, 253-254 [270 A.2d 397, 399]; *Balough v. Fairbanks North Star Borough* (Alaska 2000) 995 P.2d 245, 264; *Pharr v. Tippitt* (Tex. 1981) 616 S.W.2d 173, 177 [24 Tex. Sup. Ct. J. 392]; *Palisades Properties, Inc. v. Brunetti* (1965) 44 N.J. 117, 134 [207 A.2d 522, 533-534].)

We hold the creation of an island of property with less restrictive zoning in the middle of properties with more restrictive zoning is spot zoning. This conclusion does not end our analysis, however, as spot zoning may or may not be impermissible, depending on the circumstances. "The rezoning ordinance may be justified, however, if a substantial public need exists, and this is so even if the private owner of the tract will also benefit." (*Pharr v. Tippitt*, *supra*, 616 S.W.2d at p. 177.) "[T]he term 'spot zoning' is merely shorthand for a certain arrangement of physical facts. When those facts exist, the zoning may or may not be warranted. . . . [¶] Spot zoning may well be in the public interest; it may even be in accordance with the requirements of a master plan." (Hagman et al., Cal. Zoning Practice, *supra*, § 5.35, pp. 154-155; see *Arcadia Development Co. v. City of Morgan Hill*, *supra*, 197 Cal.App.4th at p. 1536 [spot zoning may be upheld if public would benefit from it].)

12

*Were the Creation of the New Zoning District and Its Application to the Project Site in
the Public Interest, and Were Those Decisions Arbitrary or Capricious,
or Devoid of Evidentiary Support?*

Foothill's overriding argument is that the change in zoning of the Project site was inconsistent with the North Tustin Specific Plan. "No . . . zoning ordinance may be adopted or amended within an area covered by a specific plan unless it is consistent with the adopted specific plan." (Gov. Code, § 65455.) Under the applicable standard of review, we consider the Board's factual findings of consistency and defer to them unless "no reasonable person could have reached the same conclusion on the evidence before it." (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782.)

We note initially that the California Legislature has encouraged the development of senior citizen housing by creating a 20 percent density bonus for such projects. (Gov. Code, § 65915, subds. (b)(1)(C), (f)(3).) The Board's approval of the Project and change in zoning to permit the Project to be constructed are consistent with statewide priorities.

The creation of the senior residential housing zoning district is in the public interest and consistent with the County's general plan and with the North Tustin Specific Plan. In enacting resolution Nos. 11-038 and 11-039, the Board found, based on the facts in the administrative record, that "[t]he proposed Project would be consistent with the General Plan, NTSP, as amended, and Senior Living Ordinance." As defined in ordinance No. 11-008 creating the senior residential housing district, only senior housing units, not other types of multidwelling uses (such as apartment buildings), can be built on the Project site. Also, the development standards are consistent with the surrounding residential single-family zoning district. We reach this conclusion based on our review of

13

the many factual findings of consistency with the applicable general and specific plans, which are included in the administrative record.

The housing element, one of nine elements of the County's general plan, provides, in relevant part: "The special housing needs of seniors are an important concern in Orange County. This is especially so since many retired persons are likely to be on fixed low incomes, at greater risk of impaction, or housing overpayment. In addition, the elderly maintain special needs related to housing construction and location. Seniors often require ramps, handrails, lower cupboards and counters to allow greater access and mobility. In terms of location, because of limited mobility the elderly also typically need access to public facilities (e.g., medical and shopping) and public transit facilities. [¶] . . . In general, every effort should be made to maintain the dignity, self-respect, and quality of life of mature residents in the County. [¶] . . . [¶] In 2000, there were 6,162 owner households and 606 renter households in unincorporated Orange County where the householder was 65 or older . . . . Of these, 1,235 elderly persons were living alone. Many elderly persons are dependent on fixed incomes and/or have a disability. Elderly homeowners may be physically unable to maintain their homes or cope with living alone. The housing needs of this group can be addressed through smaller units, second units on lots with existing homes, shared living arrangements, congregate housing and housing assistance programs."

The housing element of the County's general plan also states that the County's provision of housing for seniors involves the following: "Senior housing projects are a permitted use within any residential zoning district. The Zoning Code also provides a density bonus for the construction of senior housing projects through approval of an *Affordable Housing or Senior Citizen Housing Incentive Use Permit* (Section 7-9-140). The zoning ordinance is not considered to be a constraint to the development of senior housing because the regulations are the same as for other residential uses in the same districts."

14

The staff report of the communities planning unit to the County Planning Commission explains that the Project is consistent with the housing element of the general plan:  "The County's General Plan includes a Housing Element.  The Housing Needs Assessment . . . of the Housing Element acknowledges that the special housing needs of seniors are an important concern in the County of Orange.  The elderly maintain special needs related to housing construction and location.  The Housing Element states that every effort should be made to maintain the dignity, self-respect, and quality of life of mature residents in the County.  This applies to mature citizens who prefer to stay in their own dwellings and those who relocate to a retirement community.  According to the Housing Element, housing is one of the top five concerns among the senior population.  According to the State of California, Department of Finance, in 2000 the total population of seniors in Orange County, age 55 years and older, was at 509,043, which comprised about 17.8% of the total population.  Orange County's senior population increased to 702,919, comprising 21.8% of the total population in 2010.  It is anticipated to increase to 945,081 in 2020, which is an estimated 26.8% of the estimated total population . . . .  This is approximately an 86% increase within ten years.  [¶] The proposed project is for a 100 percent senior living community, and it will be deed restricted for those 55 years of age and older.  There are two types of living arrangements proposed—independent living and assisted living.  Some independent living units would be located in the main building.  Additionally, the bungalows would serve as independent living units, and are a good transition for people moving from larger homes to a senior living campus.  The independent residential units do not require licensing from the State of California.  The proposed project would not be a nursing facility and would not offer nursing service.  This project provides two different housing types, thus enabling residents to age in one place and not have to move as circumstances change."

The staff report also explains how the Project is consistent with the North Tustin Specific Plan:  "The project site is located within the NTSP.  Land Use Districts

15

within the NTSP serve as the applicable zoning designations. The project site's Land Use District is currently Residential Single Family (100-RSF). The 100 prefix indicates a requirement of a 100-foot frontage for each building site. Permitted uses are single detached dwelling units per building site (10,000 square feet minimum), noncommercial parks and playgrounds, riding and hiking trails, and community care facilities with six or fewer people, and public facilities. Other principal uses, such as community care facilities serving seven to twelve persons, churches, and educational institutions, are permitted subject to approval of a site development permit or a use permit. [¶] In order to allow attached housing, a Specific Plan Amendment is required to modify the land use designation in the NTSP to a new residential category, Senior Residential Housing ('SRH'). The NTSP provides several goals and policies to ensure compatibility with the existing community, promote innovative development concepts and balance housing opportunities. The proposed project is a residential use and the surrounding areas are also residential uses. The project site is surrounded on three sides (the north, south, and west) by one- and two-story single-family homes. Across the street to the east of Newport Avenue are similar single-family homes within the Saint Regis Place and Ravencrest subdivisions. The proposed senior housing project is residential in character and would meet all development standards established in the NTSP . . . . Additionally, 19 single-story bungalows are located along the far easterly and westerly portions of the project site, which were designed to be similar in scale to the surrounding residential units. . . . [¶] The site's design and orientation, including the subterranean parking, enhanced setbacks, building heights, and earthen berm along Newport Ave, visually maintain the area's residential character. The proposed architectural design and the proposed layered landscaping make this project's design suitable for the North Tustin community. The California Craftsmen architectural design provides for the varying of building mass and alternation of the materials, such as stone and woodwork, and colors of the exterior of the building. The design of the two-story main building and bungalows

16

along the perimeter incorporates variations in the roofline and architectural details and includes overhanging eaves, recessed entrances, window articulation, separated wall surfaces, tapered square columns, and varied setbacks. . . . [¶] A detailed analysis of the proposed project's consistency with the major land use design goals and policies of the various sections of the NTSP is provided in Table 5.1-2 of the Draft EIR. The analysis in Table 5.1-2 concludes that the proposed project would be consistent with the major applicable goals and policies of the NTSP. Additional discussion is contained in the Final EIR, under Sections 2.6 and 2.7, which are both topical responses for comments received about the project and its consistency with the NTSP. [¶] The project proposes a new SRH District with site development standards that are comparable to those of the RSF District . . . . The proposed Springs at Bethsaida is designed such that the setbacks are comparable to setback requirements of the RSF District. The bungalows located closest to Newport Avenue . . . are over 32 feet away from the property line. This exceeds the minimum setback requirement of both the proposed new SRH District and the RSF District. [¶] The height of the main building is proposed to be 35 feet, measured from the finished first floor level, which is proposed to be at 225.00 above sea level for the main building. This finished floor elevation is similar to the existing level for properties immediately north of the project site, off Ervin Lane, but is a slightly higher elevation than properties south of the project site, by approximately nine (9) feet. The finished floor elevation of the 13 bungalows in the rear is comparable to the existing elevation of the properties immediately south of the project site, which is approximately 216.00 above sea level, and the height of the bungalows are proposed to be up to 16 feet above finished floor. The height for the bungalows and the main building are consistent with the height limits for the RSF District. Additionally, landscaping is proposed along the perimeter of the property, and includes evergreen screening trees and hedges that will soften the visual impacts of the project for the adjacent neighbors."

17

The Board's findings in support of the final EIR provide, in relevant part: "A modification of the land use in the NTSP would meet the intent of the land use design goals and policies, enhance the role of medium and high density housing, a stated goal of the NTSP, and permit additional variety of residential densities on the Project site and would fulfill the need for additional senior housing in the community, which is consistent with the County of Orange General Plan. The Project would be in substantial conformity with the goals and policies of the General Plan and the NTSP. Changing the land use designation within the NTSP of the Project site does not set a precedent for any future land use changes or rezones. The Project site would continue to be zoned only for residential uses. No Project-level or cumulative impacts are identified." Those findings also provide: "The proposed senior living community provides an opportunity to balance housing opportunities, promote innovative development concepts, provide landscaping buffers and maintain residential character as provided in the NTSP, which from a land use policy perspective allows for orderly implementation of the NTSP and County General Plan."

In the environmental analysis section of the draft EIR for the Project, the County provided a table explaining the Project's consistency with the land use design goals and policies of the North Tustin Specific Plan. In addition to being a residential development, consistent with the residential nature of the surrounding community, the Project was found to be consistent with the North Tustin Specific Plan's setback and landscape design criteria.

We conclude the Board's findings of consistency with the general plan and the North Tustin Specific Plan are supported by substantial evidence. The creation of the new senior residential housing zoning district and its application to the Project site were in the public interest and were not arbitrary or capricious. The trial court erred in entering judgment in Foothill's favor and in issuing the writ of mandate.

18

In its minute order, the trial court concluded the County had failed to cite to a "comprehensive plan" addressing senior housing needs. Foothill did not make such an argument before the trial court, nor does it address this aspect of the minute order on appeal. We find nothing in the applicable law that would allow us to conclude the Board's approval of the new zone was arbitrary or capricious, based on the lack of a citation to a comprehensive plan regarding the housing needs of senior citizens. Even if such a citation were required, we would conclude the references to state law and to the housing element of the general plan would suffice.

Foothill argues that the Board was not permitted to conclude the change in zoning was appropriate because it had previously determined the single-family residential zone was appropriate for the site on which the Project is to be built. Specifically, in the EIR prepared in 1982 in connection with the implementation of the North Tustin Specific Plan, the Board found that the detached single-family residential zoning district was the "most appropriate and compatible" zoning district for the Project site. While this was undoubtedly true, we find that the passage of more than 30 years, the development of the County as a whole, and the changing needs of the people of the County (especially senior citizens) were proper for the Board to consider in determining that the Project site might be more appropriately rezoned for other uses.[6]

D.

*Did the Approval of the Project Violate the Establishment Clause?*

The First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, prohibits a state from making any law

---

[6] We note that, in that same EIR prepared in connection with the approval of the North Tustin Specific Plan, the County concluded that "[t]he public facility use (church) requested by the property owner, Diocese of Orange, would also appear acceptable if site design is sensitive to the effects of traffic and noise generated by public facility use." This undercuts Foothill's argument that the property could never be rezoned for any use other than single-family residential housing.

19

"respecting an establishment of religion, or prohibiting the free exercise thereof." (U.S. Const., 1st Amend.; see *Cantwell v. Connecticut* (1940) 310 U.S. 296, 303.) Article I, section 4 of the California Constitution provides: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed." As the United States Supreme Court has held, "not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon religious institutions is, for that reason alone, constitutionally invalid." (*Committee for Public Education v. Nyquist* (1973) 413 U.S. 756, 771-772.)

Among the objectives of the Project, as acknowledged by the Board in ordinance No. 11-008, is the intent to "[u]tilize the property to fulfill a faith-based mission of the Diocese of Orange which owns the property and to provide onsite faith-based services for the community," and to "[p]rovide faith-based independent and assisted living facilities for seniors with a range of housing types and densities to balance housing opportunities consistent with Land Use and Design Goal C of the NTSP." Foothill argues that because the Project fulfills a faith-based objective of the Diocese, the County and the Board violated the establishment clause of the First Amendment by rezoning the property to allow the Project to be built.

To determine whether the enactment of a statute runs afoul of the establishment clause, we consider the following: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion [citation]; finally, the statute must not foster 'an excessive government entanglement with religion.' [Citation.]" (*Lemon v. Kurtzman* (1971) 403 U.S. 602, 612-613.) The same analysis applies to governmental actions that are not strictly legislative. (*Feminist Women's Health Center, Inc. v. Philibosian* (1984) 157 Cal.App.3d 1076, 1086-1087.)

The enactment of the zoning change and the approval of the Project have a secular legislative purpose—to provide needed housing alternatives for senior citizens within the County. The primary effect of the zoning change does not advance religion;

20

rather, its primary effect is the creation of a senior residential facility, and the change from a single-family residential zoning district. Finally, the zoning change does not foster any entanglement between government and religion. A zoning change or issuance of a special use permit does not create an entanglement between government and religion just because the landowner or operator is a religious organization. We reject Foothill's argument that a land use approval equals preference if the landowner is a religious organization. The zoning change and the approval of the Project do not violate the establishment clause, under controlling United States Supreme Court authority.

Foothill makes a new, related argument in its appellate brief. Foothill argues that the new zoning district gave the Diocese a monopoly on senior residential housing. We reject Foothill's argument for the simple reason that the new zoning district has been created and is applicable anywhere in the North Tustin Specific Plan area. The fact that the Diocese's property is the first to which the new zoning district has been applied does not mean the Diocese has a monopoly on it.

III.

*FOOTHILL'S CROSS-APPEAL*

Foothill filed a cross-appeal in which it raises two issues. First, Foothill argues the trial court erred by failing to set aside the ordinance creating the new senior residential housing zoning district. As set forth in detail, *ante*, the creation and application of the new zoning district were in the public interest and were not arbitrary or capricious. Therefore, we reject Foothill's argument that the ordinance creating the new zoning district must be set aside.

Second, Foothill argues that the matter must be remanded to the trial court to rule on Foothill's claims that the approval of the Project violated CEQA. In its minute order, the trial court concluded, "[t]he ruling on the CEQA issues raised by petitioner is unnecessary given the ruling on the zoning issue." The proposed judgment and proposed

21

peremptory writ of mandate prepared by Foothill provided that the County and the Board must set aside and vacate all approvals of the Project pertaining to CEQA, among other things. Appellants objected on the grounds the judgment and writ exceeded the rationale expressed by the trial court in its minute order. The trial court agreed with Appellants: "The court has read and considered the joint objections to the petitioner's proposed judgment and writ of mandate and rules as follows: [¶] . . . Sustained as to objection that the proposed judgment and writ are in excess of the scope of the court's minute order. The project involved passage of one ordinance and two resolutions. The effect of the Court's ruling as to the ordinance regarding the SRH [(senior residential housing)] zoning amendment was to only vacate the application of the SRH zoning amendment to Real Parties['] property and not to vacate the creation of the new zone itself. The court did not vacate CEQA findings or approvals in the ordinance or resolutions."

Foothill then filed a motion for a new trial, in which it asked the trial court to clarify that the court "did *not* in any way rule on [Foothill]'s CEQA issues and therefore that those issues remain vulnerable to future legal challenge and judicial scrutiny." In their opposition to the new trial motion, Appellants argued the trial court should deny the motion because the judgment did not need any clarification. The trial court summarily denied the motion.

We conclude there was not a judgment on the merits as to the issues of compliance with CEQA. The only way to read the judgment and the peremptory writ of mandate, given the language of the minute orders dated March 8, May 10, and August 16, 2012, is that the trial court determined the Project had been blocked, based on its ruling on the zoning issues, and, therefore, the trial court did not need to decide whether the Project should also be blocked based on CEQA issues. The issue of the propriety of the Board's findings regarding CEQA is not before this court on this appeal. The Board's compliance (or alleged lack thereof) with CEQA in approving the Project was fully briefed and tried in the trial court. On remand, if Foothill intends to pursue its arguments

22

regarding CEQA, the trial court must decide whether additional evidence and/or argument will be permitted.

DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings regarding the CEQA issues. The appeal from the postjudgment order is dismissed as moot. Appellants to recover costs on appeal.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.