Filed 10/1/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| WESTSIDERS OPPOSED TO OVERDEVELOPMENT,<br>    Plaintiff and Appellant,<br>    v.<br>CITY OF LOS ANGELES et al.,<br>    Defendants and Respondents;<br>PHILENA PROPERTIES, L.P., et al.,<br>    Real Parties in Interest and Respondents. | B285458<br><br>(Los Angeles County<br> Super. Ct. No. BS165955) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard A. Fruin, Judge.  Affirmed.

Venskus & Associates, Sabrina Venskus, and Elise Cossart-Daly for Petitioner and Appellant.

Michael N. Feuer, City Attorney, Terry Kaufmann-Macias, Assistant City Attorney, John Fox and Leonard P. Aslanian, Deputy City Attorneys; Remy Moose Manley, LLP, Sabrina Teller, and Nathan George for Respondents.

Alston & Bird, Edward I. Casey, Andrea S. Warran and Max Rollens for Real Parties in Interest.

_____

Appellant Westsiders Opposed to Overdevelopment (Westsiders) appeals the trial court's denial of its petition for writ of mandate seeking to invalidate an amendment to the Los Angeles General Plan (General Plan). The City of Los Angeles (City) had amended the General Plan to change the land use designation of a five-acre development site from Light Industrial to General Commercial. The project at issue involves a mixed-use development close to a new light rail station.

Westsiders challenges the denial of its writ petition contending: (1) the City Charter (Charter) bars the amendment of the General Plan for a single project site; (2) the Charter also bars the City from allowing a member of the public to initiate an amendment; (3) the City failed to make required findings when it amended the General Plan; and (4) the amendment constituted impermissible spot zoning. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1.  *The Project*

In August 2013, Dana Martin, Jr., Philena Properties, L.P. and Philena Property Management, LLC (collectively, Philena) filed a land use permit application with the City. The project at issue involved the demolition of an automobile dealership located at the intersection of South Bundy Drive and West Olympic Boulevard, and the construction of 516 residential units, 99,000 square feet of retail floor area, and 200,000 square feet of office floor area.

That same month the City Director of Planning signed a form "initiat[ing] the plan amendment(s) as requested" by Philena. Project approval required an environmental impact report, an amendment to the General Plan changing the land use designation of the Project site from Light Industrial to General

2

Commercial, a zoning change, several conditional use permits, and a development agreement between the City and Philena.

The City's environmental impact report concluded that the Project was "consistent with applicable land use policies" adopted by the planning organization for Southern California. Those policies emphasized "focusing growth in existing and emerging centers and along major transportation corridors, creating significant areas of mixed-use development and walkable communities, targeting growth around existing and planned transit stations, and preserving existing open space and stable residential area."

In December 2015, the City issued its final environmental impact report. The following spring, the City's Advisory Agency certified the environmental impact report. In June 2016, the City Planning Commission approved the requested land use entitlements, and recommended that the City adopt an ordinance authorizing the development agreement between the City and Philena. In September 2016, the City Council approved the General Plan amendment and the project.

2.    *The Petition for Writ of Mandate*

The following month, in October 2016, Westsiders filed a petition for writ of mandate challenging the General Plan amendment.

Westsiders challenged the amendment under City Charter section 555 subdivisions (a) and (b) (Sections 555(a) and 555(b)).[1]

---

[1]    Section 555 provides in part:

"Procedures pertaining to the preparation, consideration, adoption and amendment of the General Plan, or any of its elements or parts, shall be prescribed by ordinance, subject to the requirements of this section.

Section 555(a) provides, among other things, that the City may amend the General Plan "by geographic area" when the "area involved has significant social, economic or physical identity." Section 555(b) provides that amendments may be initiated by the Council, the City Planning Commission or the Director of Planning.

Westsiders argued that the General Plan could not be amended for a "single project or single parcel" because such a small piece of land could not qualify as a "geographic area" with "significant social, economic or physical identity" as required by Section 555(a). Westsiders also argued that the City had effectively allowed Philena to "initiate" the amendment in violation of the Section 555(b).[2]

---

(a) **Amendment in Whole or in Part.** The General Plan may be amended in its entirety, by subject elements or parts of subject elements, or by geographic areas, provided that the part or area involved has significant social, economic or physical identity.

(b) **Initiation of Amendments.** The Council, the City Planning Commission or the Director of Planning may propose amendments to the General Plan. The Director of Planning shall make a report and recommendation on all proposed amendments. Prior to Council action, the proposed amendment shall be referred to the City Planning Commission for its recommendation and then to the Mayor for his or her recommendation."

[2] The petition also challenged the City's compliance with the California Environmental Quality Act (CEQA) and its approval of the development agreement for the Project. The CEQA cause of action was dismissed and is not at issue on appeal. Westsiders does not directly challenge the City's approval of the development agreement itself in this appeal, but argues that if the general

4

Following a hearing on the merits, the trial court denied the petition on the following grounds: "1. The City did not exceed its authority under L.A. Charter § 555 or abuse its discretion in approving the General Plan Amendment for the project at issue in this matter ("Project"). [¶] 2. The City did not exceed its authority under L.A. Charter Section 555 or abuse its discretion in the initiation of the General Plan amendment for the Project."

The court also denied Westsiders's request for judicial notice of two items of purported legislative history of Section 555(a): (1) a 1969 sample ballot and voter's pamphlet "showing proposed amendments to an earlier provision in the City Charter," and (2) "a portion of a Los Angeles City Council official action referring four motions and a proposal of the Building Industry Association to the City Planning Commission for recommendation on a proposed ordinance to halt the issuance of building permits." The trial court concluded that the "interpretation of City Charter section 555(a) does not require [a] review of legislative history," and the subject exhibits "refer to earlier provisions in the City Charter rather than to section 555(a)."

Judgment was entered on August 7, 2017, and Westsiders timely appealed.

### DISCUSSION

1. *Applicable Law*

   a. *Writ of Mandate*

Westsiders's appeal challenges the City's amendment of the General Plan. The "adoption of any amendment to [a general] plan or any part or element thereof is a legislative act which shall

---

plan amendment was invalid so, too, was the approval of the development agreement.

5

be reviewable pursuant to Section 1085 of the Code of Civil Procedure." (Gov. Code, § 65301.5.) "A traditional writ of mandate under Code of Civil Procedure section 1085 is a method for compelling a public entity to perform a legal and usually ministerial duty." (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 995, fn. omitted.) By contrast, "the purpose of an administrative mandamus proceeding, under [Code of Civil Procedure] section 1094.5, is to review the final adjudicative action of an administrative body." (*Vernon Fire Fighters v. City of Vernon* (1980) 107 Cal.App.3d 802, 808.)

Westsiders contends that its challenge should be reviewed under Code of Civil Procedure section 1094.5, because the City's amendment applied only to Philena's property and not to the "entire community." In support of this argument, Westsiders cites to several cases that predate the enactment of Government Code section 65301.5; Westsiders does not address how those cases can be squared with the more recent statute. (See, e.g., *Horn v. County of Ventura* (1979) 24 Cal.3d 605; *Mountain Defense League v. Board of Supervisors* (1977) 65 Cal.App.3d 723; *Patterson v. Central Coast Regional Com.* (1976) 58 Cal.App.3d 833.) We agree with respondent that, under Government Code section 65301.5, a general plan amendment is reviewable under Code of Civil Procedure section 1085, as a legislative act.

> b. *General Plan*

"The Legislature has required every county and city to adopt 'a comprehensive, long-term general plan for the physical development of the county or city. . . .' [Citation.] A general plan provides a ' "charter for future development" ' and sets forth a city or county's fundamental policy decisions about such development." (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 815.)

6

The general plan consists of a " ' "statement of development policies . . . setting forth objectives, principles, standards, and plan proposals." ' " (*Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1182.) " 'The adoption or amendment of a general plan is a legislative act. (Gov. Code, § 65301.5.) A legislative act is presumed valid, and a city need not make explicit findings to support its action. [Citations.] A court cannot inquire into the wisdom of a legislative act or review the merits of a local government's policy decisions. [Citation.] Judicial review of a legislative act under Code of Civil Procedure section 1085 [writ of mandate] is limited to determining whether the public agency's action was arbitrary, capricious, entirely without evidentiary support, or procedurally unfair. [Citations.]' [Citation.]" (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 509 (*San Francisco*).)

c.       *City Charter*

"A 'charter city may not act in conflict with its charter' [citation] and '[a]ny act that is violative of or not in compliance with the charter is void.' " (*Don't Cell Our Parks v. City of San Diego* (2018) 21 Cal.App.5th 338, 349 (*Cell*).) "A City Charter operates as a limitation or restriction over all the municipal affairs which the City is assumed to possess; it is not a grant of power, and the enumeration of powers therein does not constitute an exclusion or limitation on the City's authority. Restrictions on the City's powers may not be implied; unless the Charter expressly prohibits it from exercising its authority in a manner not otherwise limited by state or federal law, the City retains the power to do so." (*Social Services Union v. City and County of San Francisco* (1991) 234 Cal.App.3d 1093, 1101 (*Social Services*).)

7

"The principles of construction that apply to statutes also apply to the interpretation of charter provisions.  [Citation.]  'In construing a provision adopted by the voters our task is to ascertain the intent of the voters.'  [Citation.]  'We look first to the language of the charter, giving effect to its plain meaning.  [Citation.]  Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter or from its legislative history.'  [Citation.]"  (*Cell*, *supra*, 21 Cal.App.5th at p. 349.)

Additional rules of statutory construction apply specifically to the interpretation of city charters.  The controlling principle governing charter cities is "that by accepting the privilege of autonomous rule the city has all powers over municipal affairs, otherwise lawfully exercised, subject only to the *clear and explicit* limitations and restrictions contained in the charter. . . .  All rules of statutory construction as applied to charter provisions [citations] are subordinate to this controlling principle. . . .  A construction in favor of the exercise of the power and against the existence of any limitation or restriction thereon which is not expressly stated in the charter is clearly indicated.  So guided, reason dictates that the full exercise of the power is permitted except as clearly and explicitly curtailed.  Thus in construing the city's charter a restriction on the exercise of municipal power may not be implied."  (*City of Grass Valley v. Walkinshaw* (1949) 34 Cal.2d 595, 598–599 (italics added) (*Walkinshaw*); *Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 171 (*Domar*) [All limitations not explicitly stated in a city's charter "are construed in favor of the exercise of the power over municipal affairs."].)

8

"Construing a city charter is a legal issue we review de novo." (*Cell*, *supra*, 21 Cal.App.5th at pp. 349–350.) However, in "reviewing an agency's interpretation of law we exercise our ' "*independent judgment . . .* , giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action." ' " (*Id.* at p. 350.) The City's interpretation of its own charter is "entitled to great weight and respect unless shown to be clearly erroneous" and "must be upheld if it has a reasonable basis." (*Social Services*, *supra*, 234 Cal.App.3d at p. 1101.)

2.      *Interpreting Charter Section 555(a)*

Westsiders contends that the City's amendment to the General Plan—changing the Project site's land use designation from Light Industrial to General Commercial—was prohibited by Section 555(a) of the Charter. Westsiders's argument hinges on the following Charter language: "The General Plan may be amended in its entirety, by subject elements or parts of subject elements, or by *geographic areas*, provided that the part or area involved has *significant social, economic or physical identity*." (§ 555(a), italics added.) Here, the City found that the Project Site was a "geographic area" with a "unique physical and economic identity."

According to Westsiders, the Project site could not qualify as a geographic area with significant social, economic or physical identity because it is a "single lot of land." Westsiders argues that the plain meaning of "geographic area" is a "region," and a "single lot or small lot of land is not a region."

In interpreting the language of Section 555(a), we start with the plain meaning, and construe the words in context. (*Domar*, *supra*, 9 Cal.4th at pp. 171–172; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) Section 555(a) sets forth three ways

the General Plan may be amended:  (1) in its entirety; (2) by subject elements or parts of elements; or (3) by geographic area. The parties and we address only the third of these categories. The term "geographic area" refers to physical locations governed by the General Plan:  "geography" is the "study of the physical features of the earth," and "area" is a "region." (Oxford English Dictionary<http://en.oxforddictionaries.com/definition /geography [as of September 26, 2018]; http://en.oxforddictionaries.com/ definition/area> [as of September 26, 2018].)  The term "geographic area," therefore, refers to a physical region.

Westsiders argues that the term "geographic area" means a land area of a certain size larger than a single lot.  However, Section 555(a) does not limit the amendment process to a minimum area or number of parcels.  Mindful of the rule that we cannot construe a charter to restrict municipal power without clear mandate in the charter itself (*Walkinshaw, supra*, 34 Cal.2d at p. 599), we conclude there are no "*clear and explicit* limitations [or] restrictions" in Section 555(a) regarding the size of the "geographic area" that may be the subject of an amendment.  We are prohibited from implying any such limitation or restriction on the City's exercise of its power to govern municipal matters.  (*Id.* at pp. 598–599.)  Because the intent of the voters can be determined from the plain meaning of Section 555(a), we need not consider legislative history.[3]

Westsiders next argues that a single lot cannot qualify as having a "significant social, economic, or physical identity" within the meaning of Section 555(a), and, therefore, cannot be the subject of an amendment to the General Plan.  To the extent that

---

[3]    Westsiders's requests for judicial notice are denied except as to the Charter and General Plan.

10

Westsiders's argument is based on the proposition that this phrase implies a size limitation as to the geographic area at issue, as stated above, we are not empowered to read any limitation or restriction into the Charter that is not clearly and explicitly stated.

As to Westsiders's specific contention that the Project site "cannot" meet this criteria because a "car dealership in West Los Angeles is simply not that special," we disagree. There are no categorical limitations written into Section 555(a) for car dealerships in certain parts of the City or any other kind of development. More fundamentally, this argument fails to address the City's analysis of the Project site's identity based on the proposed construction: the City found that the site was one of the largest underutilized sites in the area, and that the Project would provide the first major transit-oriented development in West Los Angeles.[4] Although Westsiders argues that "the potential future uses" of the lot are "irrelevant to the requirements of Section 555," it does not cite to any authority in support of this proposition. We conclude the City satisfied the "significant social, economic, or physical identity" test.

Westsiders suggests that if we affirm the trial court, our decision would be tantamount to concluding that the General Plan may as a matter of course be amended on a lot by lot basis. Our opinion says nothing of the sort. We conclude only that, in this particular instance, the Project site, which happens to be a single lot, fell within the definition of a geographic area with

---

[4]     The Project is within walking distance (approximately 500 feet) from a Metro line light rail station.

significant social, economic or physical identity.  Not every lot will meet the Charter's requirement.

3.     *Interpreting Charter Section 555(b)*

Westsiders next argue that the City violated Section 555(b) of the Charter by allowing Philena to initiate the amendment to the General Plan.  Section 555(b) provides:  "**Initiation of Amendments.**  The Council, the City Planning Commission or the Director of Planning may propose amendments to the General Plan."  Westsiders points out that Philena's land use permit application asked the City to change the designation of the Project site from Light Industrial to General Commercial.  This, Westsiders contends, violated Section 555(b) because it amounted to a private party (Philena) "initiating" an amendment in direct contravention of the Charter.[5]  However, Section 555(b) contains no "clear and explicit limitations [or] restrictions" as to who may *request* an amendment.  After Philena filed a land use permit application *requesting* an amendment, the record shows that the Director of Planning then signed a form "initiat[ing] the plan amendment(s) as requested by the Applicant/Representative."

Section 555(b) does not prohibit the City from receiving requests for amendments that the City might consider in deciding whether to initiate the process to amend the General Plan.  The plain language of Section 555(b) states only that the "Council, the City Planning Commission, or the Director of

---

[5]     At oral argument, Westsiders's counsel accused a City official of corruption, and argued that the Director of Planning only initiated the amendment because of a donation to the official's favorite charity.  Counsel makes this serious accusation without citing to any supporting evidence in the record.

Planning" may "propose" an amendment; it does not place any limitation on whether a private party may request the City's consideration. We decline to read the term "initiation" in the title of Section 555(b) or "propose" in the body of the section as meaning that the seed for any proposed amendment must sprout in the heads of City officials without any input from private citizens. Any other result would stifle public participation in public land use decision-making.

Westsiders has not shown that the City violated the Charter by amending the General Plan for the project.

4. *The City Was Not Required to Make Explicit Findings*

Westsiders next argues that the City never made the required findings that the lot constituted a "geographic area" or that "the lot has a *significant* economic or physical identity." Westsiders does not cite to any authorities in support of this argument. In fact, the City is *not* required to make explicit findings to support the amendment of the General Plan, as the amendment is a legislative act. (*San Francisco*, *supra*, 229 Cal.App.4th at p. 509.) Nevertheless, the City *did* make explicit findings that the lot had a "unique physical and economic identity in that it represents a transit-oriented district that pursuant to the General Plan should be planned for a higher density, transit oriented mixed-use development that reduces vehicle trips and provides greater housing and local amenities to the neighborhood. The physical identity of the site is unique in that it is one of the largest, underutilized parcels in the area, within a quarter mile of a light rail station, with street frontages at the corner of a major intersection which allows it to serve as a neighborhood hub unlike other parcels in the area with smaller areas and less street frontage."

Although the City used "unique" instead of "significant" in discussing the site's "physical and economic identity," its analysis clearly shows that it found that the proposed development possessed significant physical and economic characteristics.

Westsiders next argues in one sentence that "the City's finding that the Project site has a 'unique' economic and physical identity is not supported by the evidence," and cites to 8,000 pages of the administrative record. We decline to address this contention further given that it is supported neither by argument nor specific citation to the record.[6] (See *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979.)

5.     *Westsiders Waived Its Spot Zoning Argument*

Westsiders contends the amendment for the project resulted in unlawful spot zoning because the project "is not the result of a substantial public need."[7] Specifically, Westsiders argues there is no evidence supporting the City's finding that

---

[6]     As to Westsiders's argument that Code of Civil Procedure section 1094.5 required the City to " 'bridge the analytic gap between the raw evidence and ultimate decision or order,' " citing to *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, this proposition does not apply to legislative acts. (See *Board of Supervisors v. California Highway Commission* (1976) 57 Cal.App.3d 952, 961 [holding that *Topanga* did not apply to the agency's quasi-legislative action].)

[7]      The "creation of an island of property with less restrictive zoning in the middle of properties with more restrictive zoning is spot zoning. . . .  [S]pot zoning may or may not be impermissible . . . . 'The rezoning ordinance may be justified, however, if a substantial public need exists . . . .' " (*Foothill Communities Coalition v. County of Orange* (2014) 222 Cal.App.4th 1302, 1314.)

14

"the Project will provide housing that is affordable for individuals who are employed in the majority of jobs in West Los Angeles," or "that individuals that would live in the Project would work nearby."

Westsiders did not raise this argument in the trial court. " 'It is well established that issues or theories not properly raised or presented in the trial court may not be asserted on appeal, and will not be considered by an appellate tribunal. A party who fails to raise an issue in the trial court has therefore waived the right to do so on appeal. [Citations.]' " (*Bhatt v. State Dept. of Health Services* (2005) 133 Cal.App.4th 923, 933 [affirming the denial of a petition for writ of mandamus].) We, therefore, do not consider this argument.

### *DISPOSITION*

The judgment is affirmed. Respondents are awarded their costs on appeal.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.                    DUNNING, J. *

---

\*      Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.