Filed 9/13/18 (unmodified opinion attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CITIZENS COALITION LOS ANGELES et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CITY OF LOS ANGELES et al., <br><br> Defendants and Appellants; <br><br> TARGET CORPORATION, <br><br> Real Party in Interest and Appellant. | B283480 <br><br> (Los Angeles County Super. Ct. Nos. BS162678, BS162710) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on August 23, 2018, be modified as follows:

1. The paragraph commencing on the bottom of page 5 with "First," and ending on page 6 with "for electric vehicles" is modified to read as follows:

> First, section 12 of the Ordinance created a new Subarea F within the SNAP. Subarea F is denominated as a "Large

Scale Commercial Node." Commercial developments within Subarea F that were "[(1)] over 100,000 square feet [(2)] on existing sites of over 3.5 acres in size [(3)] within a quarter-mile of a transit station, and [(4)] within a quarter-mile of freeway on and off ramps" could reach up to 75 feet in height and need only "substantially conform" with the SNAP's building facade requirements. But any such development would also be required to dedicate "at least 80%" of its ground-floor street frontage to retail uses, community facilities, and "other similar active uses"; include pedestrian throughways along that frontage; include a pedestrian plaza of at least 10 percent of the "floor area," which must feature a transit kiosk, seating for the public, and an Integrated Mobility Hub; and build out at least 20 percent of its parking for electric vehicles.

2. On page 6, the paragraph beginning with "Although two other locations" and ending with "location to be developed" is modified to read as follows:

Although two other locations within the SNAP's boundaries were 3.5 acres in size and within a quarter-mile of transit stations and freeway access (three of the four eligibility requirements for Subarea F), the Ordinance did not rezone either of those locations into Subarea F, and the City has acknowledged that the City Council would need to pass another Ordinance that redefined Subarea F to include the geographic location to be developed.

3. On page 12, the sentence beginning on line 4 with "It is also" and ending on line 8 with "commercial space" is deleted.

4.    On page 32, the paragraph beginning with "Substantial evidence" and ending with "Subarea F" is modified to read as follows:

> Substantial evidence supports the City Council's finding that the sole reasonably foreseeable consequence of creating Subarea F was the construction of the Superstore. The evidence in the administrative record indicates that the City Council has not committed itself to any modification of the currently existing commercial development on the two other parcels currently meeting Subarea F's size and proximity-to-transit requirements; that such modification is neither essential nor necessary to the creation of Subarea F; that no such modification is currently under review; that no such modification is either "intended" or "anticipated"; and that the creation of Subarea F does not create an incentive that makes modification of the existing commercial development all but certain (either on the two potential existing parcels or on other parcels that might be "cobbled together").

There is no change in the judgment.

Respondents' petition for rehearing is denied.

**CERTIFIED FOR PUBLICATION.**

_____

ASHMANN-GERST, P. J.,     CHAVEZ, J.,      HOFFSTADT, J.

3

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CITIZENS COALITION LOS ANGELES et al., | B283480 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. Nos. BS162678, BS162710) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Appellants; | |
| TARGET CORPORATION, | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Richard L. Fruin, Jr., Judge.  Reversed.

Michael N. Feur, Los Angeles City Attorney, Kenneth Tom Fong and Kimberly Ai-Hua Huangfu, Deputy City Attorneys; Burke, Williams & Sorensen, Anna Corinne Shimko, Amy E. Hoyt, and Juliet H. Cho for Defendants and Appellants City of Los Angeles and Los Angeles City Council.

Morrison & Foerster, Miriam A. Vogel; Shoreline Law Corporation, Andrew S. Pauly and Damon A. Thayer for Real Party in Interest and Appellant Target Corporation.

The Law Offices of David Lawrence Bell and David Lawrence Bell for Plaintiff and Respondent Citizens Coalition Los Angeles.

The Silverstein Law Firm and Robert P. Silverstein for Plaintiff and Respondent La Mirada Avenue Neighborhood Association of Hollywood.

\* \* \* \* \* \*

A city council passed an ordinance that (1) amended its neighborhood-based "specific plan" to create a new subzone for large commercial development, and (2) placed a half-built Super Target retail store into that new subzone. Two citizens groups attacked the city's ordinance, and the trial court ruled that the city violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] because the city treated the creation of the new subzone as a follow-on to its prior, initial approval of the Target store rather than as a entirely new "project" under CEQA.

This appeal presents two questions. First, when a public agency has previously approved an environmental impact report for a specific development and subsequently amends its specific plan to authorize that development, how is that subsequent amendment to be analyzed under CEQA—as an entirely new "project" (subject to CEQA's three-tiered approach), or instead as a project for which an environmental impact report has already

---

[1]     All further statutory references are to the Public Resources Code unless otherwise indicated.

2

been prepared under section 21166?  Second, does the ordinance in this case constitute impermissible "spot zoning" because it places the Super Target store in an "island" of ostensibly less restrictive zoning?

We hold that the city's ordinance should be examined under section 21166, and conclude that the city complied with CEQA in proceeding by way of an addendum to the prior environmental impact report because substantial evidence supports the city's finding that the specific plan amendment would not have any reasonably foreseeable environmental consequences beyond the construction of the Super Target store.  We also hold that the ordinance constituted "spot zoning," but that it was permissible because the city did not abuse its discretion in finding that its amendment to the specific plan was in the public interest and compatible with the general plans of which it was a part. Accordingly, we reverse the trial court.

### FACTS AND PROCEDURAL BACKGROUND

I. **Facts**

A. ***The Planned Target Superstore***

After initially proposing a smaller store, Real Party in Interest Target Corporation (Target) eventually applied to Defendant City Council of the City of Los Angeles (the City or City Council) to build a Super Target retail store (the Superstore).  Target sought to build a nearly 75-foot tall, three-story structure:  the third (and top) floor would house the 163,862 square-foot Superstore; the second floor would be a parking lot; and the ground floor would be home to several smaller retail stores, a pedestrian plaza, and a transit kiosk.

The Superstore was to be located at the intersection of Sunset Boulevard and Western Avenue in Hollywood, California.

That location is within two so-called "general plans" (the General Plan of the City of Los Angeles and the Hollywood Community Plan) and one "specific plan" (the Vermont/Western Transit Oriented District Specific Plan), the latter of which is also known as a Station Neighborhood Area Plan (or SNAP). At the time the Superstore was first proposed, the SNAP had five subzones (designated as Subareas A through E), and the Superstore was located in Subarea C.

### B.    *Initial Analysis and Approvals*

The City Council commissioned and prepared an environmental impact report for the Superstore.

Because the proposed Superstore exceeded the height and parking space limitations of Subarea C, among other requirements, the City Council granted eight variances (called "exceptions") from the SNAP pursuant to Los Angeles Municipal Code section 11.5.7.F.2. Taken together, these variances largely authorized the Superstore to be built as proposed.

The City Council also approved the environmental impact report. Target began construction of the Superstore.

### C.    **Target I** *Litigation*

Plaintiffs La Mirada Avenue Neighborhood Association of Hollywood (La Mirada) and Citizens Coalition Los Angeles (Citizens Coalition) (collectively, plaintiffs), both of which are "community association[s]" that "advocate for residential quality of life issues," filed separate petitions for a writ of mandate against the City (and naming Target as the real party in interest). As pertinent to this appeal, plaintiffs alleged that (1) the City's environmental impact report was deficient, thereby violating CEQA, and (2) the City Council's grant of variances

4

were not supported by substantial evidence, thereby violating the Los Angeles Municipal Code.[2]

The trial court partially denied and partially granted plaintiffs' writ petitions. The court ruled that the environmental impact report was sufficient, but that six of the eight variances were not supported by substantial evidence.[3] The court ordered all construction to cease.

Target appealed, and La Mirada cross-appealed.

### D.      *Amendment of the SNAP*

While the appeals of the trial court's judgment were pending, the City Council enacted Los Angeles Ordinance No. 184,414 (the Ordinance or SNAP Amendment).

The Ordinance changed the law in two ways relevant to this appeal.

First, section 12 of the Ordinance created a new Subarea F within the SNAP. Subarea F, denominated as a "Large Scale Commercial Node," was to be applied only to areas within the SNAP encompassing "[(1)] commercial uses of over 100,000 square feet" [(2)] on existing sites of over 3.5 acres in size [(3)] within a quarter-mile of a transit station, and [(4)] within a quarter-mile of freeway on and off ramps." Developments within

---

[2]      Plaintiffs also alleged that the City Council violated the laws on open meetings and denied them a fair hearing. Plaintiffs voluntarily dismissed the open meeting claim, and the trial court rejected the fair hearing claim.

[3]      The trial court also awarded attorney's fees pursuant to Code of Civil Procedure section 1021.5. We subsequently affirmed that award. (*La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2018) 22 Cal.App.5th 1149 (*La Mirada II*).)

Subarea F could reach up to 75 feet in height and need only "substantially conform" with the SNAP's building facade requirements. But any such development would also be required to dedicate "at least 80%" of its ground-floor street frontage to retail uses, community facilities, and "other similar active uses"; include pedestrian throughways along that frontage; include a pedestrian plaza of at least 10 percent of the "floor area," which must feature a transit kiosk, seating for the public, and an Integrated Mobility Hub; and build out at least 20 percent of its parking for electric vehicles.

Second, the Ordinance designated one location within the SNAP's area as Subarea F—namely, the location where the Superstore was being built.[4]

Although two other locations within the SNAP's boundaries were 3.5 acres in size and within a quarter-mile of transit stations and freeway access (three of the four eligibility requirements for Subarea F), the City has received no applications and has had no discussions regarding anyone seeking to construct a commercial project of 100,000 square feet or more at those locations. If such a project were ever proposed, the City acknowledged that the City Council would need to pass another Ordinance that redefined Subarea F to include the geographic location to be developed.

### E. *Dismissal of Appeal*

In light of the Ordinance, a different Division of this Court dismissed the pending appeals as moot, but left the trial court's

___

[4] La Mirada suggests in a footnote that the Superstore does not meet all of Subarea F's proximity-to-transit requirements, but has forfeited this argument by raising it for the first time on appeal in a passing reference in a footnote.

final judgment intact.  (*La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2016) 2 Cal.App.5th 586, 589-592 (*La Mirada I*).)

### F.     *Addendum to the Prior Environmental Impact Report*

The City prepared an "Addendum to the Certified [Environmental Impact Report] for the Target at Sunset and Western Project" (the Addendum).  The Addendum defined the "Revised Project" as (1) the amendment of the SNAP (as well as amendments of the Hollywood Community Plan and the Transportation Element of the City's General Plan), and (2) "all construction activities needed to complete the existing structure and the operation of" the Superstore.

The Addendum examined "whether the impacts of the Revised Project are the same, higher or lower than the Original Project" (which dealt solely with the construction of the Superstore).  To provide the most up-to-date information, the City conducted updated analyses of air quality, greenhouse gases, noise, and traffic.  The City then examined the full range of relevant environmental factors.

The City concluded that the Revised Project would "not require major revisions of the" previously certified environmental impact report because the SNAP Amendment did not involve any "new significant environmental effects or a substantial increase in the severity of previously identified significant effects." Because "none of [the] conditions . . . requiring preparation of a subsequent [environmental impact report]" under section 21166 were "present," the City proceeded by way of Addendum.

The City Council approved the Addendum.

7

## II. Procedural Background

Plaintiffs filed two further petitions for a writ of mandate. In the operative petitions, plaintiffs alleged that the City: (1) violated CEQA by relying on the Addendum rather than authoring a "subsequent, supplement, or new [environmental impact report] for the new project that included a proposed amendment of the SNAP"; and (2) committed impermissible "spot zoning" by making the less onerous zoning requirements embodied in Subarea F applicable only to the Superstore.[5]

Following exhaustive briefing and oral argument, the trial court granted the writ petition on the ground that the City violated CEQA. Because, in the court's view, the Ordinance amended the SNAP, it was an "independent project" from the Superstore, making it inappropriate to rely on an addendum that evaluated the environmental impact of only the Superstore. Thus, the City was obligated to conduct a wholly independent CEQA analysis. Further, because the Ordinance's creation of Subarea F "allows and encourages the development of large scale retail projects," the court found that the Ordinance made it "reasonably foreseeable that multiple retail projects will apply for Subarea F Status" on the two other parcels that currently meet Subarea F's size and proximity-to-transit requirements. Thus, the court concluded, the City was obligated under CEQA to conduct an "initial study" to assess whether a fully separate environmental impact report should be prepared. The court declined to proceed under the CEQA provision that applies

---

[5] Plaintiffs also alleged that the Ordinance and its approval of the Addendum violated the Los Angeles Municipal Code in a number of ways, but the trial court rejected these claims and plaintiffs have not cross-appealed.

8

"[w]hen an environmental impact report has [already] been prepared for a project" (under section 21166) because, in its view, that provision does not apply when there is a "[s]ubstantial change[] . . . with respect to the circumstances under which the project is being undertaken" (§ 21166, subd. (b)); as the court saw it, the Ordinance "changed" "the 'entitlements vehicle' for . . . its approval" of the Superstore, and thus constituted a "changed circumstance."

The court declined to reach the spot zoning issue.

After the trial court entered judgment, the City and Target filed timely notices of appeal.

## DISCUSSION

On appeal, the parties raise two issues: (1) Did the City's reliance on the Addendum violate CEQA, and (2) Did the City engage in impermissible "spot zoning"?[6] In evaluating both of these questions, our task is to evaluate what *the agency*—here, the City Council—did. (§ 21168.5 [as to CEQA]; *Foothill Communities Coalition v. County of Orange* (2014) 222 Cal.App.4th 1302, 1307 (*Foothill Communities*) [as to spot zoning].) We owe no deference to the trial court. (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 80 (*City of Richmond*) ["In reviewing compliance with CEQA, we review the agency's action, not the trial court's decision"]; see *Foothill Communities*, at p. 1307 [same, as to spot zoning].)

---

[6] Although the trial court did not reach the spot zoning issue, the parties have fully briefed the issue, and we address it in the interest of providing a final resolution to this long-pending matter.

9

# I.     Is There a CEQA Violation?

Answering the CEQA question presented by this case is challenging because, in the words of the poet Henry Wadsworth Longfellow, the parties' arguments are "[s]hips that pass in the night."  Plaintiffs argue that the Ordinance amended the SNAP to create a "free-floating" subzone that is attractive to large commercial development; that the Ordinance is therefore a "project" separate and distinct from the construction of the Target Superstore; and that the City is therefore required by CEQA to start from the beginning by conducting an "initial study" of the SNAP Amendment's effects and, if warranted, an entirely separate environmental impact report.  The City and Target, on the other hand, argue that the Ordinance *both* created a new Subarea F *and* placed the Superstore into that subarea; that there is already a final environmental impact report for the Superstore; and that the City was required by CEQA only to examine whether, under section 21166, the SNAP Amendment will "require major revisions in the environmental impact report" and to prepare a supplemental report only if major revisions were necessary.  As our summaries suggest, the parties' contrasting positions even disagree on what the Ordinance does.

Accordingly, we approach the CEQA question by asking three questions:  (1) what does the Ordinance do?; (2) which provisions of CEQA apply to the Ordinance—the provisions governing "projects" for which there is no prior CEQA analysis or the provision (namely, section 21166) that applies when there has already been a prior CEQA analysis?; and (3) did the City Council comply with the applicable provision(s)?

### A. *What does the Ordinance do?*

In evaluating the meaning of the Ordinance, like any other statute, we look first to the enactment's plain language. (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1183 ["'We interpret ordinances by the same rules applicable to statutes'"]; *KB Home Greater Los Angeles, Inc. v Superior Court* (2014) 223 Cal.App.4th 1471, 1476 ["Statutory analysis begins with the plain language of [a] statute, and if that language is unambiguous, the inquiry ends there" as well].) By its unambiguous language, the Ordinance does two things: (1) it creates Subarea F, a new subzone within the SNAP for large commercial development, and (2) it moves the parcel of land where the Superstore is being erected from Subarea C into Subarea F.

Target contends that the Ordinance applies solely to Target's Superstore. Target is right insofar as the City Council only placed the Superstore's parcel into Subarea F, but it is wrong insofar as the Ordinance also more generally spells out the requirements (in terms of parcel size, development size, and proximity-to-transit) that must be met before *any* parcel can be redesignated into in Subarea F. To the extent Target invites us to disregard the Ordinance's language enumerating these eligibility requirements, it is an invitation we must decline. (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 253 [courts may not "change [the] scope [of a statute] by reading into it language it does not contain or by reading out of it language it does"].)

Plaintiffs raise three arguments. First, they assert that the Ordinance is a "free-floating" subzone that automatically puts all parcels meeting Subarea F's parcel size and proximity

requirements into that Subarea. This assertion is incorrect because the Ordinance defines the Subarea's application by reference to an attached map (Ordinance, § 12.A), and the map only designates the Superstore's parcel. It is also incorrect because a further requirement for placement into Subarea F is the development's square footage, and that requirement is necessarily absent for the two otherwise eligible parcels that do not presently contain 100,000 square feet of commercial space. Second, plaintiffs assert that two maps prepared by Target while it was lobbying for the Ordinance showed three parcels in Subarea F. This assertion is true, but irrelevant because the City Council ultimately used a map that included only one parcel—the Superstore's—in Subarea F. (See *Crespin v. Kizer* (1990) 226 Cal.App.3d 498, 514 [a legislative body's ""rejection . . . of a specific provision"" is evidence that the ultimately enacted law ""should not be construed to include the omitted provision""].) Lastly, plaintiffs assert that reading the Ordinance only to apply to Target as opposed to all three parcels would result in "haphazard" development. This concern does not trump the Ordinance's plain language. And as discussed below in the analysis of the spot zoning issue, the SNAP Amendment is consistent with the SNAP's policies and is a rational means by which the City Council is permissibly taking one step at a time.

**B.      *Under which provisions of CEQA should the Ordinance be analyzed?***

1.      *Background*

a.      *CEQA, generally*

CEQA is designed "'to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions."'" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937,

944 (*San Mateo Gardens*), quoting *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74.)  CEQA operates, not by dictating pro-environmental outcomes, but rather by mandating that "decision makers and the public" study the likely environmental effects of contemplated government actions and thus make fully informed decisions regarding those actions. (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 447; Cal. Code Regs., tit. 14, § 15002, subd. (a)(1) [a "basic purpose[] of CEQA [is] to . . . [i]nform governmental decision makers and the public about the potential, significant environmental effects of proposed activities"].)  In other words, CEQA does not care what decision is made as long as it is an informed one.

     b.  How CEQA applies to projects for which there is no prior CEQA review

When a state or local public agency is planning an activity for which there has been no prior CEQA review, CEQA dictates a "three-step process."  (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382; Cal. Code Regs., tit. 14, § 15002, subd. (k).)

In the first step, the agency is to conduct a preliminary review to assess whether the contemplated action (1) qualifies as a "project" falling within CEQA's ambit and, if it does, (2) whether the project nevertheless falls within one of CEQA's threshold exemptions.  (*California Building Industry Assn. v. Bay Area Quality Management Dist.* (2016) 2 Cal.App.5th 1067, 1080; Cal. Code Regs., tit. 14, § 15060 [discussing preliminary review].)  An action qualifies as a "project" if it is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment," and is undertaken by the public agency itself or by

13

private persons with the agency's support or approval.  (§ 21065; Cal. Code Regs., tit. 14, § 15378, subd. (a).)  As pertinent here, a "project" includes "the adoption and amendment" of a city's or county's general plan (which is its "comprehensive, long-term general plan for the physical development of the county or city") and its specific plans (which are "plans for the systematic implementation of the general plan for all or part of the area covered by the general plan").  (Cal. Code Regs., tit. 14, § 15378, subd. (a)(1); Gov. Code, §§ 65300 [defining "general plan"], 65450 [defining "specific plan].)  A project may be exempt from CEQA if it falls within any of the following types of threshold exemptions: (1) those defined by our Legislature in CEQA itself (so-called "statutory exemptions") (§ 21080, subd. (b); Cal. Code Regs., tit. 14, §§ 15260-15282); (2) those our Legislature empowered the Secretary of the Natural Resources Agency to recognize as categorically exempt (so-called "categorical exemptions") (§ 21084, subd. (a); Cal. Code Regs., tit. 14, §§ 15300-15333); or (3) the exemption for projects for which "it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment" (the so-called "common sense exemption") (Cal. Code Regs., tit. 14, § 15061, subd. (b)(3)).  If the action is not a project, CEQA requires no further action; if the action is a project but is exempt, CEQA requires the filing of a notice of exemption.  (Cal. Code Regs., tit. 14, § 15062.)

In the second step, which is only reached for a nonexempt project, the agency is to conduct a more in-depth "initial study" to assess whether there is "substantial evidence supporting a fair argument [that] the project may have significant adverse effects" on the environment.  (*Communities for a Better Environment v.*

14

*South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319; Cal. Code Regs., tit. 14, § 15064, subd. (f)(1); § 21082.2, subd. (a).)  If the initial study reveals no such effect or an effect that can be avoided entirely or mitigated into insignificance, the agency may issue a negative declaration or a mitigated negative declaration, respectively, that so indicates.  (§ 21080, subd. (c); Cal. Code Regs., tit. 14, §§ 15063, subd. (b)(2), 15070, 15071.)

In the third step, which is only reached if there is a fair argument that the project may have significant adverse environmental effects, the agency is to prepare a full-blown environmental impact report.  (§§ 21080, subd. (d), 21082.2, subd. (d).)

The threshold question of "[w]hether a proposed activity is a project" is either a "question of law" or a "predominantly legal question"; either way, it is to be decided by the courts without any deference to the agency's determination.  (*San Mateo Gardens*, *supra*, 1 Cal.5th at p. 952 [calling it a "predominantly legal question"]; *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 381-382 [calling it "an issue of law"].)

     c. How CEQA applies to projects for which there has been prior CEQA review

When a state or local public agency is considering a project for which there has already been prior CEQA review—whether that review has led to the preparation of an environmental impact report or instead to the issuance of a negative declaration (mitigated or not)—section 21166 provides that the agency is *not* to prepare a "subsequent or supplemental environmental impact report" or negative declaration unless:  (1) "[s]ubstantial changes are proposed in the project which will require major revisions of the environmental impact report" or, if the prior review

15

precipitated a negative declaration, the preparation of an environmental impact report; (2) "[s]ubstantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report" or, if the prior review precipitated a negative declaration, the preparation of such an environmental impact report; or (3) "[n]ew information, which was not known and could not have been known at the time the environmental impact report was certified as complete," or the negative declaration was issued, "becomes available." (§ 21166 [applying when prior CEQA review prompted an environmental impact report]; *San Mateo Gardens*, *supra*, 1 Cal.5th at p. 949-950 [extending § 21166 to situations in which the prior CEQA review resulted in a negative declaration].) Indeed, unless one of these three exceptions applies, the agency *may not* prepare a new or supplemental environmental impact report. The agency must instead prepare an addendum to its prior CEQA analysis. (Cal. Code Regs., tit. 14, § 15164; *San Mateo Gardens*, at pp. 946-947; *Melom v. City of Madera* (2010) 183 Cal.App.4th 41, 48-49 (*Melom*); *Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 103 (*Citizens for a Megaplex-Free Alameda*).)

Because the question "whether an initial environmental document remains relevant despite changed plans or circumstances—like the question whether an initial environmental document requires major revisions due to changed plans or circumstances—is a predominantly factual question," our Supreme Court has held that "[i]t is . . . a question for the agency to answer in the first instance, drawing on its particular expertise." (*San Mateo Gardens*, *supra*, 1 Cal.5th at pp. 952-953.)

16

Judicial review is accordingly confined to assessing "whether the agency's determination is supported by substantial evidence." (*Id.* at pp. 943-944, 953; *Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 204-205 (*Latinos Unidos*).)  This more deferential review standard means that courts give greater deference to a public agency's determination whether *further* CEQA review is required than they do to whether, as noted above, *initial* CEQA review is required.  This differential treatment "'represents a shift in the applicable policy considerations'":  Because, by this point in time, "'in-depth review has already occurred,'" "'the interests of finality'" are weightier, and "the statutory presumption flips in favor of the developer and against further review."  (*Melom*, *supra*, 183 Cal.App.4th at pp. 48-49; *Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1049-1050.)  The question is no longer whether to conduct the environmental review process in the first place, but rather "'whether circumstances have changed enough to justify repeating a substantial portion of th[at] process.'"  (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 55.)

        2.     *Analysis*

It is undisputed that the City prepared an environmental impact report regarding the Superstore.  Because the activity at issue in this case is not a change to the Superstore itself but instead the Ordinance amending the SNAP (to create a new subzone and to place the Superstore in that subzone), the question arises:  Is the amendment of the SNAP a project for which there has been prior CEQA review (which would make section 21166 applicable), or is it an entirely new project (which would call for the initiation of CEQA's three-step analysis)?

17

As our Supreme Court recently held, the answer to this question does not turn on "any abstract characterization of the project as 'new' or 'old.'" (*San Mateo Gardens*, *supra*, 1 Cal.5th at p. 944.) Instead, it turns on "whether the previous environmental document retains any relevance in light of the proposed changes . . . ." (*Ibid.*)

A prior environmental document will in most cases remain relevant when the prior CEQA analysis and the current CEQA analysis pertain to related projects at the same level of generality—that is, when both deal with a "specific development" or both deal with a more generalized "program" (such as a general plan or a specific plan). (*San Mateo Gardens*, *supra*, 1 Cal.5th at pp. 943-944 [prior and current actions deal with community college district's district-wide facilities improvement plan]; *Latinos Unidos*, *supra*, 221 Cal.App.4th at pp. 196-197, 203-205 [same, as to city's general plan]; *Citizens for a Megaplex-Free Alameda*, *supra*, 149 Cal.App.4th at pp. 102-104 [prior and current actions deal with development of theater complex]; *Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1392 (*Mani Brothers*) [same, as to residential development]; *Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1070-1071 [same]; *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 704 [same, as to water recycling development]; *Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1544 (*Fund for Environmental Defense*) [same, as to medical research and laboratory complex development]; *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 166-167 [same, as to light rail development]; *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1477-

18

1478 [same, as to winery development]; see generally Cal. Code Regs., tit. 14, §§ 15161 [defining "specific development" environmental impact report], 15168 [defining "program" environmental impact report].)

But what if the related projects operate at different levels of generality? What if, as here, the prior CEQA analysis pertained to a specific development while the current project deals with a more generalized program? Or vice versa? Does this difference render section 21166 inapplicable?

We conclude that the answer is "no," and do so for three reasons. First, the primary consideration as to whether section 21166 applies is whether "the previous environmental document retains any relevance in light of the proposed changes . . . ." (*San Mateo Gardens*, *supra*, 1 Cal.5th at p. 944; cf. *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1320-1321 [new development-level project would develop agricultural lands exempted from development (and thus not studied) under the prior, program-level environmental impact report; section 21166 inapplicable].) That consideration looks to the continued relevance of the information provided by the prior CEQA analysis, not the type of project for which it was generated. Second, courts have more generally declined to "attach[] too much significance" to the ""semantic label"" a project bears. (See *Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1048 ["the 'fact that this [environmental impact report] is labeled a "project" rather than a "program" [report] matters little . . .' for purposes of its sufficiency as an informative document"]; Cal. Code Regs., tit. 14, § 15160 [granting agencies discretion how to classify environmental impact reports—as between program- and

19

development-level].)  Lastly, placing definitive weight on the label would lead to an absurd result.  If the City had enacted the Ordinance first (and, consistent with CEQA, studied its environmental effects, which would at a minimum have studied the effects of building the Superstore), there is little doubt that section 21166 would govern whether the City needed a further report if there was a subsequent change to the Superstore project; we see no reason why the result should be any different just because the Superstore's CEQA review came first.  In both scenarios, section 21166 applies because the prior CEQA analysis "retains . . . relevance in light of the proposed changes . . . ."  (*San Mateo Gardens*, at p. 944.)

As discussed below, the dispute in this case centers on how the City should have examined the environmental impact arising from Subarea F's potential to encourage further large commercial developments.  By definition, the environmental impact of the Superstore as a large commercial development placed in Subarea F is part of that analysis.  As a result, the prior environmental impact report that studied the Superstore "retains . . . relevance." (*San Mateo Gardens*, *supra*, 1 Cal.5th at p. 944.)  Indeed, the CEQA guidelines themselves specify that projects that could be categorized either as a change to a general or specific plan or as the approval of a specific development be evaluated under CEQA as a specific development (Cal. Code Regs., tit. 14, § 15378, subd. (d); *Christward Ministry v. Superior Court* (1986) 184 Cal.App.3d 180, 195-196 (*Christward Ministry*)), which reinforces the propriety of evaluating the Ordinance—which operates at both a program and development level—by reference to the development, including prior analyses of that development.

20

Plaintiffs suggest that it may be inappropriate to rely upon the previously prepared environmental impact report for the Superstore because, in their view, that report is defective. However, the accuracy of the information in the prior CEQA analysis does not affect its relevance under section 21166. (*Melom*, *supra*, 183 Cal.App.4th at p. 49 [section 21166 applies "'even if the initial review is discovered to have been inaccurate and misleading in the description of a significant effect or the severity of its consequences'"].) What is more, plaintiffs challenged the prior report, and the trial court rejected their challenges. The trial court's final judgment affirming the validity of the prior CEQA analysis that was left intact after the *La Mirada I* appeal is now final and cannot now be collaterally attacked. (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 339 ["'collateral attack on a final judgment'" is only permissible where the prior judgment is "'*void* because of an absence of "fundamental jurisdiction"'"]).

For these reasons, we will examine the propriety of the City's conduct under section 21166.

### C. Did the City comply with section 21166?

#### 1. What is the standard for further environmental review under section 21166?

##### a. When do changes or new information require major revisions to a prior CEQA analysis?

As explained above, section 21166 provides that, where an agency has engaged in a prior CEQA review that retains relevance to the project currently under consideration, the agency must file an addendum (either to a prior environmental impact report or prior negative declaration) *unless* (1) there have been "[s]ubstantial changes" in either the project or the circumstances "under which the project is being undertaken" "which will require

21

major revisions" of the prior environmental impact report or negative declaration, or (2) there is "[n]ew information" that was "not known and could not have been known" at the time of the prior CEQA review. (§ 21166.) If these conditions exist, the agency must prepare a "subsequent or supplemental" report. (*Ibid.*)

CEQA itself provides no further guidance on what these standards mean, but the Guidelines interpreting CEQA do. Those Guidelines indicate that "major revisions" to a CEQA review document will be required, and that "new information" will warrant a new document, when the project currently under consideration "involve[s] . . . new significant environmental effects or a substantial increase in the severity of previously identified significant effects" or the "new information" shows the same. (Cal. Code Regs., tit. 14. § 15162, subd. (a).) This inquiry into whether a prior CEQA review of a project is sufficient in scope vis-à-vis subsequent changes to that project is, in our view, functionally indistinguishable from the question whether a current CEQA review of a project is sufficient in scope vis-à-vis possible future actions flowing from that project. In both instances, the fundamental question is the same: Does the existing CEQA document encapsulate all of the environmentally significant impacts of the project? In the latter instance, further CEQA analysis is required only (1) if the "future expansion or other action . . . is a reasonably foreseeable consequence of the initial project," and (2) if that "future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 396 (*Laurel Heights*).) We hold that the same test

22

should be applied in both instances, including under section 21166.

       b. When is a consequence reasonably foreseeable?

  The inquiry into whether a consequence of a project is reasonably foreseeable (and thus requires further CEQA review) depends on how broadly CEQA construes the concept of reasonable foreseeability. Although that concept could be defined very broadly (because, as courts have noted in other contexts, on a "clear judicial day[,] . . . a court can foresee forever" (*Thing v. La Chusa* (1989) 48 Cal.3d 644, 668)), the courts have taken a more Goldilocks-esque approach when defining the concept of reasonable foreseeability under CEQA.

  On the one hand, construing reasonable foreseeability too narrowly means that a consequence may not be evaluated until it is "too late." This is problematic because the failure to consider a consequence (1) can violate CEQA's mandate that agencies consider the cumulative and total effect of a project rather than "chopping a large project into many little ones[,] each with a minimal potential impact on the environment" (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284 (*Bozung*); Cal. Code Regs., tit. 14, § 15378, subd. (a) [defining "project" as "the whole of an action"]; (2) risks that the agency will not consider that consequence until after the project has been approved, at which point the "steamroller effect of development" makes it nearly impossible to deflect the "momentum" for that project (*Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1031 (*Environmental Council*)); and (3) risks that the agency will have already otherwise made up its mind, rendering any study of the consequence little more than "'a burdensome reconsideration of

23

decisions already made'" or a "'"*post hoc* rationalization[] to support action already taken" [citation]'" (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1221-1222 (*Banning Ranch*); *Laurel Heights*, *supra*, 47 Cal.3d at pp. 394-395).  (Accord, Cal. Code Regs., tit. 14, § 15004, subd. (b) [environmental impact reports "should be prepared as early as feasible in the planning process to enable environmental considerations to influence project[,] program[,] and design"].)

On the other hand, construing reasonable foreseeability too broadly means that a consequence may be evaluated "too early." This is problematic because "'[w]here future development is unspecified and uncertain, no purpose can be served by requiring an [agency] to engage in sheer speculation as to future environmental consequences.'" (*Laurel Heights*, *supra*, 47 Cal.3d at p. 395, quoting *Lake County Energy Council v. County of Lake* (1977) 70 Cal.App.3d 851, 854-855 (*Lake County*); *Environmental Council*, *supra*, 142 Cal.App.4th at pp. 1031-1032.)  Such "premature environmental analysis," our Supreme Court has held, is both "meaningless and financially wasteful." (*Laurel Heights*, at p. 396.)

### i.      When it is

In trying to balance these competing concerns and to fashion a definition that is "just right" for CEQA, courts have deemed a consequence of a project to be reasonably foreseeable only when that consequence is, as a practical matter, sufficiently certain to happen.  (Accord, *Laurel Heights*, *supra*, 47 Cal.3d at p. 398 [CEQA "do[es] not require prophecy"].)  The degree of certainty has been found to be sufficient in five different situations.

First, a consequence is reasonably foreseeable when the agency has already committed itself to undertake the consequence.  (Cal. Code Regs., tit. 14, § 15165 [CEQA review required where the responsible "agency" "commits . . . to" the consequence].)

Second, a consequence is reasonably foreseeable when the project under review presupposes the occurrence of that consequence—that is, when the consequence is a "necessary" and essential component of the project itself.  (*Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1223 [review of consequence required when "reviewed project legally compels or practically presumes completion" of that consequence]; see, e.g., *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829-830 [agency, when evaluating sand and gravel mining project, must also analyze water delivery system necessary for operation of the mining project]; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 729-732 [agency, when evaluating residential development, must also analyze the sewer expansion necessary for that development].)

Third, a consequence is reasonably foreseeable when it is itself under environmental review.  (*City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438, 1452 (*City of Santee*) ["'[r]elated projects currently under environmental review unequivocally qualify as probable future'" consequences "'to be considered'"]; *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, 75 ["experience and common sense indicate that projects which are under review are 'reasonabl[y] foreseeable future projects'"]; see, e.g., *Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1218-1224 [agency,

when evaluating construction of home improvement center, must also examine road realignment consequence that it approved to effectuate (and was a condition of) the home improvement center]; *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 869 [agency should consider consequence that was, at the time of the agency's review, being reviewed by a federal agency].)

Fourth, a consequence is reasonably foreseeable when the agency subjectively "intends" or "anticipates" the consequence, and the project under review is meant to be the "first step" toward that consequence. (*Bozung, supra,* 13 Cal.3d at p. 274; *Laurel Heights, supra,* 47 Cal.3d at p. 394; *Banning Ranch, supra,* 211 Cal.App.4th at pp. 1222-1223; see, e.g., *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 243-244 [agency, when evaluating rezoning ordinance, should have also examined an anticipated development project for which rezoning was the "first step"]; *Bozung,* at p. 281 [agency, when evaluating annexation of land, should have also examined housing development that was "the impetus for the . . . annexation"]); *City of Santee, supra,* 214 Cal.App.3d at p. 1454 [agency, when evaluating temporary use of interim detention center for seven years, should have also examined the indefinite use in light of evidence that the use may be more permanent]; *Laurel Heights,* at p. 398 [agency, when evaluating lease of 100,000 square feet of a building, should have also examined lease of remaining square footage that would soon become available for lease]; *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 797 [agency, when evaluating secession from existing school district, should have also examined construction of new high school for which

26

succession was "an essential step"]; cf. *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 738-739 [agency, when evaluating use of facility for 20 years, need not examine further use absent "credible and substantial evidence" of use beyond 20 years].)

Lastly, a consequence is reasonably foreseeable if the project under review creates an incentive that is all but certain to result in the consequence. (See, e.g., *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1335-1338 [agency, when evaluating construction of road and sewers, should also consider future residential development because "the sole reason to construct the road and sewer project is to provide a catalyst for further development in the immediate area"]); *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 352-353, 367-370 (*Napa Citizens*) [agency, when evaluating industrial park development, should also examine the residential development that will be necessary to fill the new jobs created by the businesses using the industrial park]; *California Unions for Reliable Energy v. Mojave Desert Air Quality Management Dist.* (2009) 178 Cal.App.4th 1225, 1244-1246 [agency, when evaluating new rule allowing for paving of roads in the desert, should also examine effect of paving projects when the agency "intended at least some actual road paving to occur"]; *Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892, 904-905 (*Terminal Plaza*) [agency, when evaluating zoning amendment that would require residential hotel owners to relocate tenants if the owners convert their property to other uses, should also examine the construction impacts necessary to relocate displaced tenants because those impacts are "undeniable"].)

If a consequence falls into any of these categories and is sufficiently certain to come to pass that it warrants evaluation under CEQA, it does not matter that the consequence might be subject to later CEQA review when its contours become more concrete. (*Bozung*, *supra*, 13 Cal.3d at p. 282.) Nor does it matter that the consequence's contours are hazy and thus its impact "cannot be gauged with exactitude." (*Terminal Plaza*, *supra*, 177 Cal.App.3d at pp. 904-905; Cal. Code Regs., tit. 14, § 15151 [agencies should proceed "in the light of what is reasonably feasible" information]; *Napa Citizens*, *supra*, 91 Cal.App.4th at p. 367 ["great detail" not required when analyzing future consequence]; see *Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 158 (*Stanislaus Audubon Society*) ["The fact that the exact extent and location of such growth cannot now be determined does not excuse the [agency] from preparation of an [environmental impact report]"].)

ii. When it is not

Conversely, a consequence is not reasonably foreseeable when it is entirely independent of the project under consideration. (*Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1223 ["two projects may properly undergo separate environmental review . . . when the projects have different proponents, serve different purposes, or can be implemented independently"]; see, e.g., *Christward Ministry v. County of San Diego* (1993) 13 Cal.App.4th 31, 42-44) [agency, when considering expansion of landfill, need not consider "independent" landfill projects]; *City of Richmond*, *supra*, 184 Cal.App.4th at pp. 75-76, 100-101 [agency, when considering expansion to refinery's

28

gasoline output, need not consider expansion to refinery's hydrogen pipeline because the two "are not interdependent"].)

A consequence is not reasonably foreseeable simply because the project under consideration makes that consequence a *possibility*—even when the public agency is subjectively aware of that possibility (that is, even when it is "a gleam in [the] planner's eye").  (*Laurel Heights*, *supra*, 47 Cal.3d at p. 398; see, e.g., *Pala Band of Mission Indians v. County of San Diego* (1998) 68 Cal.App.4th 556, 575-576 [agency, when adopting waste management plan, need not evaluate impact of future landfills just because plan identifies 10 tentative landfill sites, when there is no evidence any site will be developed]; *National Parks & Conservation Assn. v. County of Riverside* (1996) 42 Cal.App.4th 1505, 1518-1519 [agency, when evaluating a landfill project, need not evaluate possible pre-dumping processing facilities because it is unknown whether they will be built inside agency's jurisdiction]; *Lake County*, *supra*, 70 Cal.App.3d at pp. 855-856 [agency, when evaluating exploratory drilling, need not evaluate commercial drilling that will follow because it is unknown whether site being explored will be favorable]; *Towards Responsibility in Planning v. City Council* (1988) 200 Cal.App.3d 671, 680-681 [agency, when evaluating rezoning project, need not evaluate impact of new sewage treatment plant when the project only makes the need for such a plant possible]; *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1450-1451 (*Save Round Valley*) [agency, when evaluating residential development project, need not evaluate impact of future owners' decision to build second units on each lot because, while possible, there is no evidence this will occur]; *Topanga Beach Renters Assn. v. Department of General Services* (1976)

29

58 Cal.App.3d 188, 195-196 (*Topanga Beach Renters*) [agency, when considering project to restore beach to natural state, need not consider impact of future residential development on nearby properties that might seek to capitalize on pristine beach absent any "evidence" such development will occur]; *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1362 [agency, when evaluating airport development plan, need not consider expanded runway capacity that is merely possible]; *Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643, 647, 651 [agency, when considering transfer of railroad right-of-way, need not consider development of surrounding property that is possible when nature of that development is unknown]; *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 470-475 [agency, when adopting taxation district to finance future schools, need not consider impact of building those schools where adoption of district will not create need to do so].)  Indeed, it is not enough to show that the consequence is a *probability*.  (*Brentwood Assn. for No Drilling, Inc. v. City of Los Angeles* (1982) 134 Cal.App.3d 491, 502 [agency, when examining exploratory drilling, need not consider subsequent commercial drilling when results of exploratory drilling are unknown, even though exploratory drilling reveals favorable sites for commercial drilling 55 percent of the time].)

And, more to the point here, a consequence is not reasonably foreseeable merely because the project creates an incentive for that consequence to come to pass (unless, as noted above, that incentive makes the consequence all but certain). (See *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 274-275, 294-295 [agency, when considering ordinance

changing zoning rules regarding permissible hotel density, need not consider impact of future developments—even though new rules create incentive for future development—because "it is unclear whether the ordinance *will* in fact induce future development"].)

In these situations, CEQA does not exempt the consequence from environmental review; it merely postpones that review until the consequence is sufficiently certain. (See *Lake County*, *supra*, 70 Cal.App.3d at pp. 856-857 [so noting].)

   2.   *Does substantial evidence support the City Council's finding that no further environmental review is warranted under section 21166?*

Because we are applying section 21166, our task is not to assess for ourselves whether there is a fair argument that a particular consequence is reasonably foreseeable. (See *Stanislaus Audubon Society*, *supra*, 33 Cal.App.4th at pp. 152-159.) Instead, as we discuss above, our task is to assess whether substantial evidence supports the City Council's finding that no large-scale commercial developments beyond the Target Superstore are a reasonably foreseeable consequence of the SNAP Amendment's creation of Subarea F (which, in turn, means that there is no need for major revisions in the previously promulgated environmental impact report for the Superstore, and that the City Council's use of an addendum complies with CEQA).

Substantial evidence is defined as "evidence"—that is, as the "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts"—presented in the record. (§ 21082.2, subd. (c); *Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273, 291 (*Wal-Mart*); *Save Round Valley*, *supra*, 157 Cal.App.4th at pp. 1450-1451; *Topanga Beach Renters*,

31

*supra*, 58 Cal.App.3d at pp. 195-196.) Substantial evidence does not include "[a]rgument, speculation, unsubstantiated opinion or narrative." (§ 21082.2, subd. (c).) In assessing whether substantial evidence supports an agency's finding, we must "'indulge all reasonable inferences from the evidence that would support the agency's'" finding as well as "'resolve all conflicts in the evidence'" and "'all reasonable doubts'" "'in favor of'" that finding. (*Mani Brothers, supra*, 153 Cal.App.4th at p. 1397; *Citizens for a Megaplex-Free Alameda, supra*, 149 Cal.App.4th at p. 112.)

Substantial evidence supports the City Council's finding that the sole reasonably foreseeable consequence of creating Subarea F was the construction of the Superstore. The evidence in the administrative record indicates that the City Council has not committed itself to any other large-scale commercial development on the two other parcels currently meeting Subarea F's size and proximity-to-transit requirements; that such further development is neither essential nor necessary to the creation of Subarea F; that no such development is currently under review; that no such development is either "intended" or "anticipated"; and that the creation of Subarea F does not create an incentive that makes further large-scale commercial development all but certain (either on the two potential existing parcels or on other parcels that might be "cobbled together"). Indeed, the evidence suggests that the Food 4 Less store on one of the other existing potential Subarea F parcels has no plans to expand beyond its current, 70,000 square-foot size, which is 30,000 square feet too small to qualify for transfer into Subarea F.

*Christward Ministry, supra*, 184 Cal.App.3d 180 is directly on point. There, the agency amended its community-wide land

use plan to allow for the designation of landfills, but only designated a single landfill. The agency's environmental impact report examined the environmental impacts of the designated landfill, but not any of the other possible sites that could be—but were not—designated. This complied with CEQA. (*Id.* at p. 189.) This case is no different: The City created a new subzone and rezoned only one development into that subzone; updating its prior report analyzing that development also complies with CEQA.

The trial court held that section 21166 did not apply because the City Council's amendment of the SNAP altered the method by which the Superstore was approved (that is, by amending the SNAP rather than granting variances from it), and thus constituted a substantial change "with respect to the *circumstances* under which [the Superstore] is being undertaken," thereby falling into one of section 21166's exceptions. (§ 21166, subd. (b), italics added.) This analysis is incorrect because it ignores that the exception for changed circumstances by its terms only applies when that change "will require major revisions in the" agency's CEQA analysis (§ 21166, subd. (b)); a change in circumstances, by itself, is not enough. As explained above, major revisions are required only when the change creates reasonably foreseeable consequences that are not addressed by prior CEQA review; and here, there are no such consequences.

Plaintiffs make four arguments as to why the creation of Subarea F necessitates further CEQA review beyond an addendum.

First, Citizens Coalition asserts that the Addendum does not discuss the creation of Subarea F. This is factually incorrect,

33

as the Addendum defines the "Revised Project" it assesses as including both the creation of Subarea F *and* the completion of the Superstore.

Second, plaintiffs argue that the City *intended* further Subarea F developments beyond Target, as proven by (1) the amended SNAP's use of the plural (rather than the singular) in setting forth the requirements of new Subarea F, and (2) language in a report by the Department of City Planning Commission, which states that "amending the SNAP to reclassify the [Superstore] in the new Subarea F . . . recognizes that the nature of 'superstore' retail is changing" and that "there need to be new regulations in place" "for the SNAP to appropriately capture this new development typology and the jobs and economic development that come with it." The City's use of the plural versus the singular is part and parcel of setting forth new eligibility criteria and in no way calls into question the City's finding that development beyond the Superstore is not reasonably foreseeable. (Accord, *Larsen v. San Francisco* (1920) 182 Cal. 1, 10 [noting that ordinance's use of the plural is of no consequence where, as here, "the context does not limit the meaning"].) And the language in the report explains why amending the SNAP was necessary to effectuate the Superstore project as well as to spell out the eligibility criteria for Subarea F. When considered in conjunction with the other evidence that the sole Subarea F project was the Superstore and that no other projects were being contemplated, substantial evidence still supports the City's finding that development beyond the Superstore is not reasonably foreseeable.

Third, plaintiffs argue that the creation of Subarea F creates incentives for retailers to build large retail projects in

34

either (i) the other two parcels within the SNAP meeting Subarea F's size and proximity-to-transit requirements, or (ii) in new parcels meeting those requirements that can be cobbled together from smaller parcels.  Plaintiffs effectively rely on the precursor principle to *Field of Dreams*' "if you build it, they will come"— namely, "if you zone it, they will build."  We need not independently delve into whether Subarea F's requirements create a powerful incentive to build (given that those requirements also obligate retailers to build pedestrian-focused facilities and space for other retailers) because, as we explain in detail above, the City Council had substantial evidence upon which to conclude that any incentives created by Subarea F do not make development all but certain.

Lastly, plaintiffs ask us to abandon substantial evidence review in favor of independent review because ordinances (like the SNAP Amendment) are to be construed de novo.  While courts independently interpret the meaning of statutes (of which ordinances are obviously a subspecies) (*Meyers v. Board of Administration etc.* (2014) 224 Cal.App.4th 250, 256), we are not interpreting the *meaning* of the SNAP Amendment, but rather its *environmental impact*; the question of impact is, under section 21166, evaluated for substantial evidence.

## II.   Is There Impermissible Spot Zoning?

Plaintiffs argue in the alternative that the Ordinance constitutes impermissible spot zoning by putting the Superstore—but not other parcels—into the less restrictively zoned Subarea F.

"Spot zoning" occurs when a parcel of land is rezoned to give it fewer or greater rights than the parcels surrounding it. (*Foothill Communities*, *supra*, 222 Cal.App.4th at pp. 1307, 1311-

1312; *Arcadia Development Co. v. City of Morgan Hill* (2011) 197 Cal.App.4th 1526, 1536 (*Arcadia Development*).) Although spot zoning traditionally refers to the creation of "islands" with *more restrictive* zoning (e.g., *Wilkins v. City of San Bernardino* (1946) 29 Cal.2d 332, 340 (*Wilkins*); *Hamer v. Town of Ross* (1963) 69 Cal.2d 776, 781-782; *Avenida San Juan Partnership v. City of San Clemente* (2011) 201 Cal.App.4th 1256, 1268-1269 (*Avenida San Juan*), it can also refer to the creation of "islands" with *less restrictive* zoning (*Foothill Communities*, at pp. 1307, 1311-1314). Because local bodies enjoy broad legislative discretion when it comes to zoning (*id.* at pp. 1309-1310; *Wilkins*, at pp. 337-338), however, spot zoning is not necessarily invalid. (*Foothill Communities*, at p. 1314 ["spot zoning may or may not be impermissible, depending on the circumstances"].) The burden is on the party challenging the spot zoning to show that the spot zoning was invalid and hence an abuse of that discretion. (*Foothill Communities*, at p. 1309; *Wilkins*, at pp. 338-339.)

The creation of a "spot zone" is invalid only when it is not in the public interest—that is, when it is "arbitrary," "irrational," and "unreasonable." (*Foothill Communities*, *supra*, 222 Cal.App.4th at pp. 1309, 1314; *Wilkins*, *supra*, 29 Cal.2d at p. 339; *Avenida San Juan*, *supra*, 201 Cal.App.4th at pp. 1268-1269). A spot zone is in the public interest as long as "there is a reasonable basis for the belief that the [spot zone] has substantial relation to the public health, safety, morals or general welfare." (*Wilkins*, at p. 339; *Arcadia Development*, *supra*, 197 Cal.App.4th at p. 1536 [spot zone valid if any "'rational reason in the public benefit exists for such a classification'"].) And, if the spot zone is part of a specific plan, the spot zone must also—like *all* parts of a specific plan—be "compatible" with the general plan of which the

36

specific plan is a part.  (Gov. Code, §§ 65454 ["No specific plan may be adopted or amended unless [it] is consistent with the general plan"], 66473.5 [same].)  A specific plan is compatible if it is ""'in agreement or harmony with'" the terms of the applicable [general] plan, not in rigid conformity with every detail thereof." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678.)

Plaintiffs have not carried their burden of showing that the City Council engaged in impermissible spot zoning.  At the outset, it is unclear whether Subarea F amounts to less restrictive zoning because it imposes many special requirements upon developments within its confines; it is somewhat of a mixed bag.

But even if we assume that Subarea F is on the whole less restrictive, and that the creation of Subarea F for just the Superstore consequently amounts to spot zoning, it is not impermissible.  To begin, there is a "reasonable basis" for the City Council's "belief" that the creation of Subarea F "has substantial relation to the public health, safety, morals or general welfare."  (*Wilkins, supra*, 29 Cal.2d at p. 339.)  The City's staff exhaustively documented why building a Target Superstore as part of a complex with smaller retail spaces and a pedestrian plaza near subway and freeway access is in the public interest: Among other reasons, the development will "provide a much needed, convenient, high quality retail shopping center that will serve the existing community in a location that contains under-utilized commercial uses," will "provide excellent access for goods movement with a minimum disruption to adjacent residential and lower intensity neighborhoods," and will "provid[e] attractive public streetscapes" by requiring the developer to widen the

37

surrounding sidewalks, plant trees, and install bike racks and benches.  Further, and as the Addendum explains and as the City's staff also exhaustively documented, the Ordinance (as a SNAP amendment) is "compatible" the City's General Plan, the Hollywood Community Plan, and the SNAP itself because Subarea F provides for development that is "urban scaled, pedestrian friendly, [and] transit oriented."

Rather than attack the specific findings of the City's staff as to how the Ordinance is in the public interest and is compatible with the other applicable plans, plaintiffs make what amount to five other challenges.

First, they contend that the City never made a finding that the Ordinance was in the public interest.  We reject this argument.  The law requires a "reasonable basis" for such a finding (*Wilkins*, *supra*, 29 Cal.2d at p. 339), not an express finding.  What is more, and as detailed above, the City's staff *did* make such a finding and, more to the point, explained its basis for that finding.

Second, plaintiffs assert that the Ordinance is not in the public interest because it was enacted to legitimize what the trial court previously held was an invalid project and to "allow[] Target to benefit from its arrogant . . . construction of the Project during the pendency of litigation."  However, the City Council's *motive* for enacting the Ordinance is irrelevant because "the validity of legislative acts must be measured by the terms of the legislation itself, and not by the motives of, or [the] influences upon, the legislators who enacted the measure."  (*City and County of San Francisco v. Cooper* (1975) 13 Cal.3d 898, 913; *Wal-Mart*, *supra*, 138 Cal.App.4th at p. 302.)

Third, plaintiffs argue that the City staff's findings regarding public benefit are "boilerplate" (and thus presumably entitled to no weight), that the Superstore complex confers no greater benefits than the original store Target originally proposed to build, and that the sole beneficiary of the Ordinance is Target. By these arguments, plaintiffs ask us to second-guess the City Council's assessment of what is in the public interest. We must decline this request because "'the wisdom or good policy of a zoning ordinance is for a municipality to determine and the courts have nothing to do with it.' [Citations.]" (*Tandy v. City of Oakland* (1962) 208 Cal.App.2d 609, 612; *Fund for Environmental Defense, supra*, 204 Cal.App.3d at p. 1545 ["it is not our task to judge the wisdom of the [agency's] action"].)

Fourth, plaintiffs suggest that the reasons that justify placing the Superstore in Subarea F would justify—if not compel—the development of other large-scale commercial projects, which taken as a whole is not in the public interest. This suggestion overlooks the fundamental rationale of the law underlying spot zoning. "The essence of spot zoning," like the essence of equal protection, "is irrational discrimination." (*Avenida San Juan, supra*, 201 Cal.App.4th at p. 1268 [spot zoning]; *Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1118, 1142-1143 [equal protection].) The law of equal protection recognizes that legislatures may lawfully proceed by taking one step at a time. (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 488.) The same is true for spot zoning. The City Council retains the power to assess whether future large-scale commercial developments are in the public interest; nothing in the Ordinance robs the City Council of that power.

Lastly, plaintiffs intimate that the Ordinance is incompatible with the SNAP because it alters it.  The plain import of this argument is that a SNAP may never be amended.  That is clearly not the law.  (Gov. Code, §§ 65453, 65454; *Foothill Communities*, *supra*, 222 Cal.App.4th at p. 1310 ["The approval of a specific plan does not create a vested right to develop property in a manner consistent with the specific plan, or to prevent development inconsistent with it"].)

## DISPOSITION

The judgment is reversed.  Target and the City are entitled to their costs on appeal.

## **CERTIFIED FOR PUBLICATION.**


_____, J.
HOFFSTADT

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
CHAVEZ